NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0666n.06

Case No. 07-4191

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Sep 29, 2009**

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE NORTHERN |
| DONNA J. MOONDA, | ) DISTRICT OF OHIO |
| | ) |
| Defendant-Appellee. | ) |
| | ) |
| ———————————————— | ) |

BEFORE:   BATCHELDER, Chief Judge, DAUGHTREY, Circuit Judge; and VAN TATENHOVE[*], District Judge.

ALICE M. BATCHELDER, Chief Judge.   For her involvement in the shooting death of her husband, Donna Moonda ("Donna" or "Moonda") was convicted by a jury on charges of interstate stalking resulting in death, and the following capital offenses:  murder for hire and two counts of using a firearm during a crime of violence resulting in death.  On appeal, Moonda claims that there was insufficient evidence to support her convictions and that the district court abused its discretion in refusing to allow a jury view of the crime scene.  Finding no merit in these contentions, we AFFIRM.

I.

In 2004, Moonda was fired from her job at the University of Pittsburgh Medical Center in

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Greenville, Pennsylvania, for stealing prescription painkillers. Moonda was charged with a felony in connection with the thefts and was placed on probation without a verdict. As part of her probation requirements, Moonda began attending group therapy sessions at a drug rehabilitation center. There, she met Damian Bradford ("Bradford"), a small-time drug dealer and fellow therapy-group member. The two fast became friends and soon developed a sexual relationship. Moonda, who was married to wealthy urologist Gulam Moonda ("Dr. Moonda" or "Gulam"), began showering Bradford with gifts: she gave him large amounts of cash, bought a Chevy Trailblazer for him, and paid for him to move into a new apartment. Moonda also bought Bradford a cell phone and bought a second phone for herself so that they could communicate by voice calls and text messages.

At some point prior to May 2005, Moonda talked to Bradford about killing her husband. She told Bradford she wanted to get a divorce and that her husband had "offered her a million dollars to walk away," but she refused that offer because "she wanted to get what she deserved, what was owed to her."[1] Moonda's initial plan was for Bradford to follow Dr. Moonda to a mosque in Youngstown, Ohio, where the doctor worshiped every Friday, and to "find a chance to kill him." Bradford testified that he "was to receive half of everything she was supposed to get," which Donna told him would be anywhere from $3 million to $6 million.

When Bradford could not find an opportunity to shoot Dr. Moonda in the course of his travels to and from the mosque, Donna assured Bradford "there was another time coming up soon." Donna told Bradford that she and Gulam were planning to visit Toledo, Ohio, to look at a house Gulam's

___

[1]Under the Moondas' prenuptial agreement, if the couple divorced Donna would receive only $250,000, half the couple's cars, half of any jointly held assets acquired after the agreement, and half the contents of the couple's home. Under the terms of Dr. Moonda's will, Donna would receive all the contents of the house, a life estate in the house, 20% of his gross estate (estimated at $4.1 million at his death); she expected as well $2.4 million to $2.8 million in distributions outside the will.

nephew intended to purchase. The plan was for Bradford to follow the Moondas on their drive into Ohio; Donna would at some point pull her car onto the shoulder of the road, and this would be Bradford's cue to pull in behind, take Gulam's wallet, and then shoot him. Thus, Bradford's job was to make the murder look like "a robbery gone bad." Donna even asked Bradford to shoot her and give her a "flesh wound," but he refused.

Friday, May 13, 2005, was the day of the Moondas' trip to Toledo. That morning, Donna called Bradford and arranged to meet him in Moravia, Pennsylvania — halfway between her home in Hermitage and his home in Aliquippa. There, Donna gave him a computer printout of their driving route. Bradford returned to his apartment, dressed in all black, and then drove to a store near the Moondas' home. While Bradford waited in the store parking lot, Donna sent him two "dummy" or "signal" text messages stating "I'm getting something to drink before I go" and "You enjoy the beautiful day. I will text you when I can. I love you." These messages were intended to alert Bradford that the Moondas were about to depart. When the Moondas — accompanied in their vehicle by Dorothy Smouse, Donna's mother — passed by the parking lot in Gulam's champagne-colored Jaguar, Bradford pulled onto the street and followed.

This caravan eventually made its way onto the Ohio Turnpike, where the Moondas and Bradford pulled into a Portage County service plaza. Ms. Smouse and the Moondas went inside to use the restroom and purchase food and drinks while Bradford waited outside. Before she entered the plaza, Donna turned and looked directly at Bradford. As the group got back into their vehicles, Donna assumed driving duties in their car. Approximately thirty minutes later, Donna pulled onto

an emergency shoulder or berm area on the right side of the turnpike. Bradford did the same;[2] by the time Bradford had stopped his vehicle and exited, Donna and Gulam had gotten out of their car. Bradford ordered Dr. Moonda back into the car and demanded his wallet. Donna handed the wallet, which was in her purse, to Gulam, and after he handed it to Bradford, Bradford shot him once in the head. Bradford then jumped back into his vehicle and drove away.

Donna and her mother flagged down a passing motorist, who called an emergency number posted on a nearby sign. Local paramedics and later a life flight helicopter team arrived, but their efforts to revive Dr. Moonda were unsuccessful, and he was pronounced dead at the scene.

Ohio Highway Patrol Trooper Brian Mercer interviewed Donna at the scene. She explained that during their stop at the Portage service plaza, Dr. Moonda had opened his wallet to pay for some water, but had only $50 bills. Donna told Trooper Mercer that they put the wallet away, and Ms. Smouse paid with a $5 bill. She also said that Ms. Smouse commented about Dr. Moonda's carrying so much money in public. Donna told Mercer that her husband did the same thing when he was buying soup and a sandwich a short while later, and that he ended up paying for those items with a $50 bill.

Donna further told Trooper Mercer that when she pulled onto the emergency berm, she did not notice that anyone had pulled in behind her. She claimed that as she and Gulam got out of the car to switch seats, someone ran up shouting: "Give me your wallet, get in the car[.]" After Gulam handed the wallet to the man, she heard "a muffled bang." Donna insisted to Mercer that she could

---

[2]Robert Hudson testified that he was driving on the Turnpike near Exit 161 on May 13, 2005, between 6:37 and 6:40 p.m., when he saw a tan metallic luxury sports car, followed by a second car, simultaneously veering from the left lane to the center lane, from the center lane to the right lane, and from the right lane onto the emergency berm. From his rearview mirror, he then saw the luxury car pull to an abrupt stop, followed by an SUV.

not remember many details about the robber's appearance; she could say only that the assailant was short, dressed in all black, had a mean voice, and drove away in a black van. Later that evening, Donna related essentially the same story to Trooper Darren Huggins.

Investigator Judy Neel of the Ohio Highway Patrol took over the investigation of Dr. Moonda's murder. A turnpike ticket found on Dr. Moonda revealed that the Moondas had entered the turnpike at 5:09 p.m.; turnpike records showed that another driver entered at the same time and entrance as the Moondas and exited at the closest exit to the murder scene at 6:34 p.m., the time the Highway Patrol received the emergency call. Neel also obtained surveillance video footage from the Portage service plaza from that evening; the video showed that Donna actually possessed her husband's wallet at all times.

Further investigation of Donna led investigators to Damian Bradford. Pursuant to a search warrant, they searched Bradford's apartment on May 20, 2005, and seized two cell phones from him; the officers then obtained a court order to retrieve the cell tower locations that had been used on May 13, 2005, by Bradford's and Moonda's phones. Using this information, investigators were able to track the movement of their phones throughout that day. The officers determined that during the late morning and afternoon hours of May 13, Bradford's and Moonda's phones traveled towards one another to share a common tower at a point between their respective homes and then traveled back to use the towers closest to their homes. Later that afternoon, Bradford's phone again began using towers progressively north of his apartment, until it reached a tower in the Hermitage, Pennsylvania, area, where the Moondas lived. Bradford's phone was using the Hermitage tower when he received Donna's text messages stating that she was "getting something to drink" and that Bradford should "enjoy the beautiful day."

5

After that, Bradford's phone made its way into Ohio, where it used the tower closest to the Portage service plaza at 6:04 p.m, the very time that the Moondas were seen on surveillance video purchasing drinks and snacks there. At 7:09 p.m., Bradford's phone used the same tower near the Portage service plaza. Using time-distance calculations, officers determined that between 6:04 p.m. and 7:09 p.m., Bradford would have been able to drive from the Portage plaza to the exit nearest the shooting, and back to the Portage plaza. Subsequent tower information revealed that Bradford's phone was traveling east towards Pennsylvania, and then used Pennsylvania towers the rest of that night. In the months following the murder, private citizens and law enforcement officers discovered Dr. Moonda's wallet, business and credit cards, and driver's license scattered in the median and along the eastbound lanes of the turnpike.

Although the plan had been for Donna to deny Bradford's involvement if he got caught, she refused to testify at his trial. Having lost his "star witness," Bradford entered into a plea agreement, which recommended a 210-month sentence in exchange for his truthful testimony against Donna. Bradford confessed to shooting Dr. Moonda, provided details of the murder plan, and told investigators where to find the gun. Following Bradford's information, investigators found a .9 millimeter handgun between mile markers 237 and 238 on the turnpike. The gun had the word "WITNESS" stamped on the side, as did a gun given to Bradford by a friend in 2004. Although the gun's condition had deteriorated due to its prolonged outdoor exposure, testing revealed that the gun had the same rifling characteristics as the one used to shoot Dr. Moonda.

On August 16, 2006, a federal grand jury indicted Moonda for one count of interstate stalking resulting in death, in violation of 18 U.S.C. §§ 2261A and 2, and three capital counts: one count of murder for hire, in violation of 18 U.S.C. § 1958, and two counts of using a firearm during a crime

6

of violence resulting in death, in violation of 18 U.S.C. § 924(j). In early September, the government filed a notice of intent to seek the death penalty.

Prior to trial, on April 25, 2007, Moonda filed a motion requesting a jury view of the crime scene. The government opposed the motion, and the district court on May 1, 2007, entered an order directing the United States Marshal to advise the court whether a jury view could be conducted safely. After the U.S. Marshal advised the court that a jury view would be "a logistical nightmare" and would "severely jeopardize the safety and security of a potential jury, court staff, and Deputy US Marshals," the court denied the motion on May 7, 2007, finding that available aerial photographs adequately depicted the scene. On May 18, 2007, Moonda filed a motion to reconsider, arguing that the jury view could be conducted from an access road running parallel to the turnpike. Moonda submitted with the motion several photographs and a video of the alternate jury view site. The court reviewed the photographs and video, and again consulted with the Marshal, who advised that the "access road" was actually a narrow, gravel path that "would pose a safety hazard to all parties involved." Accordingly, the court denied the motion for reconsideration on June 14, 2007.

Testimony began in the guilt phase of the trial on June 18, 2007, and continued through July 5, 2007. On July 6, 2007, the jury convicted Moonda on all counts. At the close of the penalty phase, on July 18, 2007, the jury determined that Moonda should receive a sentence of life imprisonment for her murder-for-hire conviction, and that she should receive a sentence less than death or life imprisonment for her two convictions for using a firearm during a crime of violence resulting in death. On September 21, 2007, the district court sentenced Moonda to life imprisonment for the murder-for-hire count and to 360 months' imprisonment on the remaining three counts, to run concurrently, followed by five years of supervised release. Moonda filed a premature Notice of

7

Appeal on September 24, 2007, which became valid once the district court issued its judgment on September 25, 2007.

## II.

Moonda presents four arguments on appeal. First, she argues that her murder-for-hire conviction must fail because there was insufficient evidence to show that she promised Bradford anything of pecuniary value for killing her husband. Second, she argues that her interstate stalking conviction cannot stand because there was insufficient evidence to prove her intent to kill, injure, harass, or intimidate her husband. Third, she contends that her firearm convictions must be overturned, given that the predicate offenses (murder-for-hire and interstate stalking) are unsubstantiated. Fourth, she contends that the district court abused its discretion in refusing to allow a jury view of the crime scene.

### A.    Was there sufficient evidence to show Moonda promised Bradford anything of pecuniary value for killing her husband?

"When deciding if a conviction is supported by sufficient evidence, we determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Vasquez*, 560 F.3d 461, 468-69 (6th Cir. 2009) (quoting *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir.2007)) (emphasis in original). "All conflicts in the testimony are resolved in favor of the government, and every reasonable inference is drawn in its favor." *Id.* at 469 (citing *United States v. Bashaw*, 982 F.2d 168, 171 (6th Cir.1992)). "In examining claims of insufficient evidence, this Court does not 'weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury.'" *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009) (quoting

8

*United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir.1999)).

Moonda insists that there was insufficient evidence to support the consideration element of her murder-for-hire conviction under 18 U.S.C. § 1958(a), which provides:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

18 U.S.C. § 1958(b) defines "anything of pecuniary value" as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage."

Moonda argues that there was no testimony from which the jury could infer that Moonda made "a promise or agreement to pay" Bradford for killing Dr. Moonda. This argument ignores significant portions of the trial transcript. Bradford testified that Donna's initial plan was for him to shoot Dr. Moonda during one of the doctor's weekly visits to his Youngstown mosque. Bradford explained what was at stake for him:

> AUSA: If you had a plan to kill Dr. Moonda, what were you — what was in it for you?
>
> Bradford: I was to receive half of everything she was supposed to get.
>
> AUSA: And do you know how much that might have been, or did she tell you, I'm sorry, how much that might have been?
>
> Bradford: I was under the influence of anything from three to $6 million.

9

AUSA: And where does that — where did that figure come from?

Bradford: Donna herself.

Bradford testified that when he never found an opportunity to shoot Dr. Moonda on any of those occasions, Donna assured him that "there was another time coming up soon that she would let me know about, and this was the Toledo trip."

Moonda argues that Bradford's testimony on cross-examination shows that she never promised him anything for killing her husband:

Defense Counsel: How much money did you get up front for committing this murder?

Bradford: None.

Defense Counsel: What assurances did you have that she would give you any money for killing Dr. Moonda?

Bradford: None.

Defense Counsel: Did you have so much control over Donna Moonda that you thought that if you killed her husband, she would give you half of whatever she inherited?

Bradford: No.

This exchange does not undercut Bradford's previous testimony that Moonda promised him half her share of the estate. That Bradford did not have any "assurances" that Moonda would keep her promise, and had no "control" over her to force her to keep the promise, does not mean that the promise was not made. In fact, during recross-examination, defense counsel specifically asked Bradford to affirm that Donna had made the promise:

Defense Counsel: Wasn't it, in fact, your story that it was her intention to give you $3 million?

10

Bradford: Yes, sir.

Defense Counsel: In fact, wasn't it her intention to give you one half of whatever the estate was, whether it was $6 million or $3 million?

Bradford: Yes, sir.

To the extent there are any conflicts in Bradford's testimony on this point, we must resolve the conflict in favor of the government. *Vasquez*, 560 F.3d at 469. It was the jury's prerogative to credit Bradford's testimony, and his testimony was sufficient to support their conclusion that Moonda promised or agreed to pay Bradford something of pecuniary value as consideration for his murdering Dr. Moonda.

> **B.      Was there sufficient evidence to show that Moonda had the intent to kill, injure, or harass Dr. Moonda?**

Moonda argues there was insufficient evidence to support her interstate stalking conviction under 18 U.S.C. § 2261A because "the trip from Hermitage, Pennsylvania to Toledo, Ohio was made for purposes wholly unrelated to any alleged harm intended toward the victim in this case." This argument is entirely without merit.

18 U.S.C. § 2261A provides:

> Whoever — (1) travels in interstate or foreign commerce . . . with the intent to kill, injure, [or] harass . . . another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, or causes substantial emotional distress to that person . . . shall be punished as provided in section 2261(b) of this title.

Moonda contends that she lacked the requisite intent because the purpose of the Moondas' trip to Toledo was to look at a house that Dr. Moonda's nephew was planning to purchase. The statute, however, criminalizes interstate travel with "*intent* to kill, injure, [or] harass," not interstate travel with the *sole purpose* to kill, injure, or harass. Indeed, in interpreting the similar intent requirement

11

in the murder-for-hire statute, 18 U.S.C. § 1958, we have held that "'[t]he fact that travel is motivated by two or more purposes, some of which lie outside the ambit of the Travel Act, will not preclude conviction under the Act if the requisite . . . intent is also present.'" *United States v. Degan*, 229 F.3d 553, 557 (6th Cir. 2000) (quoting *United States v. Gooding*, 473 F.2d 425, 428 (5th Cir.1973)).

Moreover, Moonda's indictment charges that she "did willfully induce and procure Damian Bradford to travel in interstate commerce from Pennsylvania to Ohio with the intent to kill, injure, harass, and intimidate Dr. Gulam Moonda . . . in violation of Title 18, Section 2261A and 2, United States Code." In charging Donna Moonda with a violation of 18 U.S.C. § 2, the government charged her as a principal in this offense on the theory that she "aid[ed], abett[ed], counsel[ed,] command[ed], induce[d] or procure[d] its commission." Even if one could plausibly interpret § 2261A as requiring the felonious intent to be the sole purpose of the travel, the evidence amply demonstrates that Damian Bradford's only reason for traveling to Ohio was to shoot Dr. Moonda, at Donna's direction.

After Bradford was unsuccessful in carrying out Moonda's and Bradford's initial plan to kill the doctor during a trip to his mosque, Moonda informed him "there was another time coming up soon" and that the Moondas "were supposed to go look at his nephew's house, and she would let [Bradford] know" how they could use that opportunity to murder him. On the day of the Toledo trip, Moonda met Bradford and gave him a map of their planned route. As the Moondas departed for Toldeo, she sent Bradford two "dummy" text messages to signal that they were leaving. And as planned, Donna took over the driving and shortly thereafter pulled her car to the side of the turnpike, giving Bradford the opportunity to rob and shoot Dr. Moonda. While Bradford fled back to

12

Pennsylvania, Donna told responding officers the planned "diversion" story — that they should be looking for a short man in a black van. And, of course, Moonda herself never went to Toledo, but returned with her family members to her Pennsylvania home late that night. There was more than enough evidence before the jury to permit them to determine that Moonda instructed Bradford to travel in interstate commerce with the intent to kill Dr. Moonda, and that Moonda herself embarked for Toledo to facilitate that killing.

### C. Was there sufficient evidence to support Moonda's convictions for violating 18 U.S.C. § 924(j)?

18 U.S.C. § 924(c)(1)(A) provides:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(j) provides: "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall — (1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life."

The government charged Moonda with two counts of violating § 924(j) for using a firearm during and in relation to crimes of violence (murder-for-hire and interstate stalking) that caused the death of Dr. Moonda. Moonda argues that because her convictions on these two predicate offenses

13

are based on insufficient evidence and must be reversed, her convictions under § 924(j) must be reversed as well. But contrary to Moonda's claim, the evidence is entirely sufficient to support the convictions on both the murder-for-hire and interstate stalking charges. This claim is meritless.

**D.    Did the district court abuse its discretion in refusing to allow a jury view of the crime scene?**

We review a district court's evidentiary rulings for abuse of discretion. *United States v. White*, 563 F.3d 184, 191 (6th Cir. 2009). In particular, "[a] trial court's decision to allow or disallow a jury viewing of an alleged crime scene is highly discretionary." *United States v. Triplett*, 195 F.3d 990, 999 (8th Cir. 1999); *see also United States v. Passos-Paternina*, 918 F.2d 979, 986 (1st Cir. 1990) ("The federal courts recognize their inherent power to permit a jury view of places or objects outside the courtroom. The decision to permit a view is entrusted to the sound discretion of the trial court.").

Moonda contends that the district court abused its discretion in denying her motion for a jury view of the emergency berm area on the Ohio Turnpike where the shooting occurred. Part of the government's trial theory was that Moonda's claimed inability to identify her husband's shooter — the man with whom she had been engaged in a sexual relationship for months prior to the murder — indicated that she was lying to investigators to cover up the murder conspiracy. Moonda hoped to convince the jury that the visual and auditory distractions of the turnpike, coupled with the stress of the robbery, hindered her from identifying the assailant. She therefore wanted the jury to have a first-hand perception of the environment as it existed at the time of the shooting.

Although the district court initially indicated that it was inclined to grant a jury view, it ultimately found, based on the U.S. Marshal's recommendation, that a view was not feasible. The

Marshal advised that "[e]ven partial lane closures to accommodate this could lead to disastrous consequences cause[d] by vehicle accidents due to increased congestion and rubbernecking." "In addition," the Marshal noted, "it would be a logistical nightmare to shut down all lanes of the turnpike for miles prior to the crime scene in an effort to accomplish this task." The court heeded the Marshal's warning and found that Moonda would be able adequately to present her case using aerial photographs of the scene and the testimony of a scene reconstruction expert. When Moonda asked for an alternative location on an access road running parallel to the turnpike, the court reached a similar conclusion, based on the logistical difficulties and safety hazards involved with taking a group so large down a gravel path and up an embankment, just to look at the scene through a chain-link fence.

Without question, there would be inherent dangers in conducting a jury view next to a heavily trafficked turnpike. And, in any event, even if the Marshal, in conjunction with the Ohio Highway Patrol, could safely close some or all of the turnpike lanes near the scene, the result would be a decrease in traffic and an environment different from the one at the time of the murder. Conducting the view from an access road some distance away from the scene of the murder would also have been of limited help to the jury and would have presented its own dangers. Moreover, Moonda presented the testimony of her reconstruction expert, who went to the emergency berm area under traffic conditions similar to those existing at the time of the shooting. He conducted decibel readings and testified about how loud the road noise was, even with mild to moderate traffic. Finally, the court reasonably concluded that the aerial photographs of the scene gave the jury an adequate picture of the surroundings. We find no abuse of discretion here.

**III.**

15

For the foregoing reasons, we **AFFIRM** the judgment of the district court.