RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TERRENCE JAMAL WILLIAMS, aka Terrance Jamal
Williams (State Prisoner #588573),

　　　　　　　　　*Petitioner-Appellant*,

　　　*v.*

SHERRY L. BURT, Warden,

　　　　　　　　　*Respondent-Appellee*.

No. 18-1461

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:13-cv-14493—Thomas L. Ludington, District Judge.

Argued:  January 30, 2020

Decided and Filed:  February 11, 2020

Before:  SUTTON, BUSH, and READLER, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Yaira S. Dubin, O'MELVENY & MYERS LLP, New York, New York, for
Appellant.  Scott R. Shimkus, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL,
Lansing, Michigan, for Appellee.  **ON BRIEF:**  Jennifer Sokoler, Anton Metlitsky, Catherine
Nagle, O'MELVENY & MYERS LLP, New York, New York, for Appellant.  Scott R. Shimkus,
MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

CHAD A. READLER, Circuit Judge.  Terrence Williams (often referred to as "Terrance
Williams" in court documents) was sentenced to life imprisonment without parole for his role in

a drive-by shooting outside a Detroit nightclub. That verdict and sentence came at the close of an eventful trial—one marked by outbursts, threats toward witnesses, and offensive language—transgressions committed by witnesses, spectators, and counsel alike. After a particularly contentious incident involving a witness and defense counsel, the court took protective action, temporarily closing the courtroom to spectators before reopening it a few days later.

On direct appeal, and now in this habeas proceeding, Williams argues that the temporary closure violated his Sixth Amendment right to a public trial. Terry Price, Williams's trial counsel, failed to object to the closure, however, meaning that Williams defaulted his public trial claim in the state proceeding. And he has not overcome that failure by showing that his counsel was constitutionally ineffective, which might otherwise constitute cause and prejudice excusing the default. We accordingly **AFFIRM** the judgment of the district court.

## BACKGROUND

Following an evening at a nightclub in southwest Detroit, Carl Hairston, Jerrance Lewis, and Thomas Cook left the club together in the same vehicle. As they drove away, a light-blue minivan pulled up next to them. From an open door, a passenger inside the minivan wielding an AK-47 fired more than twenty shots into the neighboring vehicle. The vehicles collided, tearing off the open minivan door. The minivan then sped off, leaving Hairston dead, Lewis severely injured, and Cook unharmed.

Following an investigation, officers recovered a burned minivan with its rear passenger-side door missing. Tracing the minivan, and aided by a lead that "Joe Green" was involved in the shooting, officers discovered that the vehicle was registered to Juanita Williams, the mother of Terrence Williams and Joseph Green.

When he recovered from his wounds, Lewis identified Williams and Green as his assailants. The two were well-known to Lewis. In addition to seeing them driving the same minivan previously, Lewis had fought with Williams and Green on prior occasions. During one of those engagements, Williams shot Lewis in the hand.

Williams and Green were indicted on charges for murder and assault with intent to murder. A four-week trial followed. But irregularities emerged almost right away, starting with the testimony of Cook, who served as the prosecution's first witness. Though Cook had signed a pre-trial statement indicating that his assailants were driving a light-blue minivan, at trial Cook claimed not to know what vehicle the assailants were driving. The prosecution attributed Cook's inconsistent testimony to intimidation from spectators in the courtroom. The trial court, however, found no basis to believe there had been "any overt attempt to influence [Cook's] testimony."

Improper spectator participation also became a concern during the testimony of Williams's mother and of his maternal aunt. On each occasion, the court was informed that spectators were coaching the witnesses and having inappropriate conversations with them about their respective testimony. The court warned the spectators that improper communication or other interference would result in exclusion from the remainder of the trial. Despite this warning, the court did not exclude a spectator who, a few days later, was seen "making gestures and mouthing words" during the testimony of the mother of the deceased victim.

These episodes came to a head when Lewis took the stand. The night before his preliminary examination, Lewis's home was firebombed. Undeterred, Lewis gave testimony consistent with his prior statement to officers, testifying on direct that Green and Williams were the shooters. While off the stand, Lewis told the prosecutor that, as he was testifying, he felt he was being threatened by glares and gestures from defense counsel. And on the third day of his testimony, after completing a portion of cross-examination, Lewis openly accused defense counsel of threatening behavior. As Lewis left the stand, the following exchange occurred between Lewis, defendant Green, the prosecutor, and defense counsel:

| | |
|---|---|
| *Lewis.* | You see that? |
| *Prosecutor.* | I did see that. Yeah, I did see that with Mr. Price looking at the witness. |
| *Lewis.* | Telling me I'm dead and all this. |
| *Prosecutor.* | Wait a minute. I've been watching him during the trial. These witnesses— |
| *Green.* | They just making that little n* * * * * lying. |

| | |
|---|---|
| *Green's Counsel.* | Hey. Hey. Hey. |
| *Lewis.* | Get the f* * * on. What you talking about, boy? Get on. |
| *Court Officer.* | Have a seat. Have a seat. Have a seat. |
| *Prosecutor.* | Mr. Lewis, you're all right, don't let these people get to you. You should be ashamed of yourself. |
| *Williams's Counsel.* | You should be ashamed of yourself. You don't know what you talking about. |
| *Lewis.* | I know you 'bout to get— |
| *Williams's Counsel.* | How you gonna play me? He ain't no boss of nothing. |

To allow cooler heads to prevail, the court called a recess. When trial reconvened, defense counsel denied any intent to intimidate Lewis, claiming that his looks and gestures were just his way of studying Lewis as he testified. Despite an admonition from the court, defense counsel stated his intention to continue his conduct.

At that point, the court decided that closing the courtroom was the best path forward. Citing repeated interference from spectators, the court remarked that emotions were "running much higher than almost any other case I've had . . . they have to get under control." In the interest of securing the courtroom and preserving the integrity of the proceedings, the court announced that the courtroom would remain closed for the remainder of the day, with the decision regarding the closure of subsequent proceedings to be decided at a later date. Defense counsel did not object to the closure.

The courtroom remained closed for the remaining two days of Lewis's testimony, as well as during the entirety of the testimony of Williams's cellmate, Cornelius Ware. Testifying in the closed courtroom, Ware stated that Williams confessed to the crime while the two were in jail together. Following Ware's testimony, the trial was reopened to the public.

Once the prosecution rested, Williams presented his case. Williams testified along with four others, each of whom contradicted the narrative offered by the prosecution. At the close of its deliberations, the jury convicted Williams of first-degree premeditated murder and assault with intent to murder. The court sentenced Williams to serve life in prison without parole for the former and twenty to thirty years in prison for the latter.

On direct appeal, Williams argued, among other things, that the closure of the courtroom violated his Sixth Amendment right to a public trial, and that his counsel was ineffective for failing to object to this and other issues at trial. *See generally Williams*, No. 286097, 2011 WL 6004067 (Mich. App. Dec 1, 2011). In view of defense counsel's failure to preserve the issue through an objection, the state appeals court applied plain error review to Williams's public trial claim. *Id.* at \*5. Yet even under that nominal standard, the appeals court found that counsel's conduct fell below Sixth Amendment standards, rendering counsel's assistance constitutionally ineffective. *Id.* at \*11. Citing the strength of the government's case, however, the appeals court concluded that "the result of the proceeding would not have been different" if counsel had performed differently, and accordingly denied relief on that ground. *Id.* The Michigan Supreme Court denied Williams leave to appeal. *People v. Williams*, 812 N.W.2d 747 (Mich. 2012) (mem.); *People v. Williams*, 817 N.W.2d 56 (Mich. 2012) (mem.).

Following his state court proceedings, Williams filed in federal court a petition for relief under 28 U.S.C. § 2254. Among the claims raised in the petition were those regarding a public trial and ineffective assistance of counsel. After the district court denied relief, we granted Williams a certificate of appealability for his public trial claim as well as for his ineffective assistance of counsel claim (limited to counsel's failure to object to the courtroom closure). *Williams v. Burt*, No. 18-1461 (6th Cir. Aug. 30, 2018).

**ANALYSIS**

Part and parcel of federal habeas corpus litigation is an accompanying bevy of procedural rules and requirements, from myriad common law standards to a variety of federal statutes. While familiar to the federal courts, application of this body of authority is not always easy or straightforward. *Thomas v. Romanowski*, 362 F. App'x 452, 455 (6th Cir. 2010) (describing the landscape surrounding habeas procedural bars as a "complicated and changing area of law"). Today's case is no exception.

A. Williams's appeal turns on the application of the procedural default bar to awarding habeas relief. In respecting that settled rule, we must answer at the outset whether Williams has forfeited a right he seeks to enforce in this habeas proceeding by defaulting the claim during his

underlying Michigan state court proceedings. *Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1068 (6th Cir. 2015). Sometimes, a petitioner neglects to raise a claim during the entirety of his state court proceeding, yet later seeks to pursue the claim through federal habeas litigation. In that circumstance, out of respect to the relevant state's finality interests, the petitioner typically is deemed to have procedurally defaulted the claim, meaning we will not then review it in a habeas posture. *Lovins v. Parker*, 712 F.3d 283, 304–05 (6th Cir. 2013) (holding that the petitioner's claim under *Chambers v. Mississippi*, 410 U.S. 284 (1973), was procedurally defaulted because he failed to raise it in state court).

But Williams's circumstance is not so straightforward. Williams failed to preserve his public trial issue in the state trial court, but he then raised the issue on appeal. And the reason he gave the appellate court for his initial failure was the ineffective assistance he received from his trial counsel, a right the Constitution, through the Sixth Amendment, ensures to him. *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984).

Before we find that Williams has procedurally defaulted his public trial claim, then, we must conclude that: (1) Williams failed to comply with a state procedural rule; (2) the Michigan state courts enforced the rule; (3) the Michigan procedural rule is an adequate and independent state ground for denying review of Williams's federal constitutional claim; and (4) Williams cannot show cause and prejudice excusing the default. *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc). There is little doubt Williams's circumstances meet each of the first three markers: The Michigan courts enforced a well-recognized procedural rule requiring that a litigant, to preserve an issue for appeal, first raise the issue below.

True, in enforcing its procedural bar, the Michigan Court of Appeals did not entirely "deny review" of Williams's claim, in the strictest sense of the phrase. As is common practice in the Michigan courts (and in other courts too, including ours), the appeals court instead gave Williams's public trial claim truncated consideration, reviewing the claim only for plain error in view of the fact that Williams raised the claim for the first time on appeal. *See People v. Carines*, 597 N.W.2d 130, 137–39 (Mich. 1999). For purposes of federal habeas review, however, a state court's decision to employ plain error review to otherwise abandoned arguments does not excuse a petitioner's default. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006)

(citing *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000)). Across many cases, we have consistently held that application of the plain error standard to an unpreserved claim does not save a petitioner from a defense of procedural default raised at the habeas stage. *See, e.g.*, *id.* at 765; *Fleming v. Metrish*, 556 F.3d 520, 530 (6th Cir. 2009) (citing *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)).

That settled practice seeks to balance two weighty—but sometimes competing—virtues of our legal system: avoiding injustice on the one hand, and preserving comity on the other. As to the former, it is well understood that preventing manifest injustice is a core function of any reviewing court. *See Lundgren*, 440 F.3d at 765 ("Plain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits."). Plain error review plays a critical role in helping avoid such injustice, and so we understandably do not seek to encourage state courts to forego such efforts. *Id.* But by the same token, the procedural default bar honors fundamental features of our federal system of government. With an eye on state-federal comity concerns, we, sitting as a federal tribunal, customarily refuse to disturb state court judgments on grounds neglectfully not raised in state court. *Williams v. Anderson*, 460 F.3d 789, 799 (6th Cir. 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 731 (1991)). Enforcing the procedural default bar against the backdrop of a state court's earlier plain error review thus respects the interests of justice in the state's legal system while honoring the federalism and comity principles that animate many habeas procedural limitations. *See id.*; *see, e.g.*, 28 U.S.C. § 2254(d).

B. With the first three procedural default factors resolved against him, Williams emphasizes the fourth. That is, he contends there is cause and prejudice to excuse his procedural default in state court. The reason? Williams says his counsel was constitutionally ineffective.

Generally speaking, counsel's deficient performance in state court can serve as grounds for excusing a petitioner's procedural default. *Kelly v. Lazaroff*, 846 F.3d 819, 829 (6th Cir. 2017) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). In assessing whether counsel functioned in such a deficient manner as to constitute cause and prejudice excusing the default, we measure counsel's performance against the familiar backdrop of *Strickland*. As the Supreme Court explained there*,* the right to effective assistance of counsel is grounded in the Sixth

Amendment's fundamental guarantee of the right to counsel for criminal defendants. 466 U.S. at 686 (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). In view of that fundamental right, counsel will be deemed constitutionally "ineffective" where she commits errors so serious as to effectively deny a defendant the right to counsel, if those errors result in prejudice to the defendant. *Id.* at 687. Satisfying the *Strickland* standard, however, is difficult. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task.").

Before making that assessment, we note one issue regarding the lens through which we view the *Strickland* factors as part of the broader procedural default analysis. Because the Michigan Court of Appeals addressed Williams's ineffective assistance of counsel claim on the merits, and as we sit in collateral review of those proceedings, the State contends that our review is governed by the exacting standards set forth in the Antiterrorism and Effective Death Penalty Act (or AEDPA). *See* 28 U.S.C. § 2254(d). Satisfying AEDPA's standards is difficult by design. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Before we may award habeas relief, AEDPA requires not just that we find the state court's decision to be wrong. Rather, we must conclude that its decision was so far off the mark as to constitute "an unreasonable application of clearly established Federal law." *Johnson v. Genovese*, 924 F.3d 929, 933 (6th Cir. 2019) (quoting 28 U.S.C. § 2254(d)). Coupling that deferential standard with the demanding *Strickland* standard would put in place a nearly insurmountable obstacle to Williams's path to relief. *See Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (internal quotations and citations omitted).

Unlike when reviewing Williams's habeas claim on the merits, however, we have sometimes said that AEDPA deference does not cabin our review of the cause and prejudice aspect of procedural default. *Hall v. Vasbinder*, 563 F.3d 222, 236–37 (6th Cir. 2009). We need not decide whether this position is correct today. *Cf. Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2019); *Richardson v. Lemke*, 745 F.3d 258, 273 (7th Cir. 2014). Williams's claim fails even under the more friendly *de novo* standard of review.

*Trial Counsel's Performance Was Deficient.* We first consider whether Williams was effectively deprived of his right to counsel by his attorney's errors. In doing so, we "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

One indicator of counsel's deficiencies, says Williams, was counsel's combative behavior during and after Lewis's testimony. Counsel indisputably argued with Lewis, then sixteen years old, as Lewis left the witness stand. Counsel may also have been mouthing threats to Lewis during his testimony. These misdeeds, the record suggests, were the proverbial straw that broke the court's back. Following this episode, and after additional contemplation, the trial court closed the proceedings temporarily.

Counsel's actions fell well outside the acceptable range of conduct. It is difficult to imagine a legitimate strategic objective counsel sought to achieve through his combative conduct, in particular, openly confronting a minor who, after barely surviving a murder attempt, seeing a friend shot and killed, and having his home firebombed on the eve of his testimony, bravely testified for multiple days in the ensuing murder trial. Even if one could divine such a strategy, counsel's methods for executing it were neither reasonable nor professional. *See id.*

These antics alone, however, are not enough to demonstrate constitutionally deficient performance. Satisfying the *Strickland* standard requires more than just demonstrating deficiency; it also requires demonstrating a cause-and-effect relationship between the deficient performance and any prejudice suffered by the defendant. *Id.* at 687. And while counsel's conduct towards Lewis reflected deficient performance, that is not the prejudicial event Williams says demonstrates ineffective assistance under *Strickland*. Rather, says Williams, it was the trial court's decision to close the courtroom during the remainder of Lewis's testimony (and the entirety of Ware's).

That turns our attention, then, to counsel's failure to object to that decision. In challenging that aspect of his counsel's performance, Williams faces the same hurdle: Counsel's decision not to object to the closure is presumed to have been a reasonable strategic decision under *Strickland*. *Johnson v. Sherry*, 586 F.3d 439, 446 (6th Cir. 2009). Turning back the clock

to the period following Lewis's testimony, there are reasons why counsel might have objected to closing the courtroom, including to allow the defendant's family to be present at all points of the trial. But there are also reasons why counsel might have chosen, as he did, not to object to closing the courtroom. One would be to keep the victim's relatives out of the jury's view. Another would be to keep sensitive proceedings private. And yet another could be the desire to avoid drawing the jury's attention to the intimidation of witnesses that allegedly had been occurring in the courtroom to that point.

Absent other indicators, counsel's failure to object could fairly be described as a judgment call by counsel, something that rarely amounts to constitutionally ineffective assistance. *See Strickland*, 466 U.S. at 689. But here, there is one other indicator to consider— one that may have served as a less appropriate reason for counsel to forgo objecting to the closure. That is counsel's role in causing the closure. While an objection would have honored Williams's right to a public trial, it also may well have put the spotlight on counsel's questionable courtroom antics that precipitated the closure. In that way, counsel may have been conflicted in his motives; his decision may have been influenced as much by his personal interests as those of his client. Taking all of this together, counsel's failure to object, combined with the specter of a conflict of interest, constituted deficient performance in this specific setting. *See Whiting v. Burt*, 395 F.3d 602, 610–11 (6th Cir. 2005) (explaining that conflicts of interest that adversely affect counsel's performance can sustain a claim for ineffective assistance).

The failure to object, moreover, may have precipitated a constitutional error by the trial court. Closing the courtroom is in tension with the "presumption of openness" favoring public trials. *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)). Only rare circumstances justify courtroom closures. *Waller*, 467 U.S. at 44–45. One notable example is the repeated disruption of courtroom proceedings. *Drummond v. Houk*, 797 F.3d 400, 401 (6th Cir. 2015). With the scales thus tipped dramatically in favor of open proceedings, a trial court must explain in detail its reasoning for closing the courtroom, including whether it considered alternative measures, and how it narrowly tailored the remedy it is imposing to achieve the specific interests it seeks to protect. *Simmons*, 797 F.3d at 413 (quoting *Waller*, 467 U.S. at 48).

This is where we find some fault with the trial court. No one doubts the difficult situation the court faced in trying this murder case. Even from a cold record, one can easily feel the hot tempers in the courtroom. The trial participants had a lengthy history of animosity, the courtroom was crowded, and the spectators were animated. The court had admonished at least three spectators, and other spectators were raising security concerns. *See Williams*, 2011 WL 6004067, at *8. To the court's eye, passions in the courtroom were "running much higher than almost any other case I've had." *Id.* But in then taking the considerable step of closing the courtroom altogether for some of Lewis's (and all of Ware's) testimony, the court's explanation was wanting. It did not explain, for instance, how closing the courtroom to the public would prevent another altercation between Lewis and defense counsel, the event that precipitated the closure. It did not explain how closing the courtroom would tamp down emotions for the participants, who would still engage with each other and with observers once the participants left the courtroom.

Nor did the court appear to consider any alternatives to complete closure, or to justify the remedy it employed. *Cf. United States v. Brazel*, 102 F.3d 1120, 1155 (11th Cir. 1997) (requiring courtroom spectators to show identification before entering the courtroom where spectators were allegedly engaging in conduct that might intimidate witnesses). For instance, in justifying the closure for Ware's testimony, the court cited vague security concerns shared by courtroom security officers surrounding transporting a prisoner. Those concerns might fairly be a basis for modifying courtroom procedures, and we appropriately afford deference to security officers and others in how to run a courthouse. *See Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 49–50 (1985) (recognizing that courtroom security officers have "considerable expertise in transporting prisoners"); *see also United States v. Moonda*, 347 F. App'x 192, 201 (6th Cir. 2009) (finding that a district court properly "heeded [a] Marshal's warning" regarding "logistical difficulties and safety hazards" in structuring a criminal trial). But to take the dramatic step of closing a courtroom, especially for one or more reasons that might otherwise appear to be rather customary aspects of everyday courthouse life, the trial court needed to say more. In the absence of a more fulsome record, the closure seemingly was not "narrowly tailored" to the ends the court sought to achieve. *Waller*, 467 U.S. at 45. And given those flaws, counsel likely would have been justified in objecting to that procedure, or, at the very least, in

suggesting alternative measures or demanding additional explanation. Whether an error occurred, however, ultimately does not affect today's outcome, as Williams cannot establish that his defense was prejudiced by the closure.

*Williams Fails To Establish Prejudice Resulting From The Courtroom Closure.* Williams claims he was prejudiced by what he alleges was a deprivation of his public trial right. Like the right to effective counsel, the public trial right is also secured by the Sixth Amendment. "In all criminal prosecutions," the Sixth Amendment commands, "the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. The right serves to promote the interests of fairness, accuracy, and transparency for the defendant, and for the public more broadly. *Waller*, 467 U.S. at 46. With its constitutional pedigree, the public trial right is considered a fundamental aspect of criminal trial proceedings, meaning that violations of the right typically are recognized as structural errors, for which prejudice to the defendant is presumed. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017).

In *Weaver*, however, the Supreme Court retreated from its historical practice of uniformly treating a public trial violation as a structural error that presumes prejudice to the defendant. It concluded that a different approach was appropriate in instances where a defendant ties together public trial and ineffective assistance of counsel claims. Unnecessary trial closures, while structural errors, the Supreme Court explained, "[do] not lead to fundamental unfairness in every case." *Id.* at 1908. And in the specific posture in which the defendant seeks a second chance at a public trial claim, having passed on the claim once before, the defendant carries the burden to demonstrate prejudice. *Id.* at 1913. That result strikes "the proper balance between the necessity for fair and just trials and the importance of finality of judgments." *Id.*

In view of *Weaver*'s clear command, it is nonetheless fair to ask whether the rule in *Weaver* applies in today's setting. *Weaver*, it bears noting, involved a courtroom closure during *voir dire*, not during the trial's guilt phase, a fact not lost on the Supreme Court. The Supreme Court went out of its way to explain that its decision represented binding authority only when trial proceedings are closed during jury selection. *Id.* at 1907. We thus have some room to consider *Weaver*'s applicability to trial proceedings other than the *voir dire* phase.

Before *Weaver*, a fractured panel of this Court held on collateral review, in considering whether counsel's ineffective assistance excused the petitioner's procedural default, that prejudice is presumed for trial closures during the guilt phase. *Sherry*, 586 F.3d at 443; *but see id.* at 450 (Kethledge, J., dissenting) (arguing that "clearly established Supreme Court precedent [did not] require[] the Michigan state courts to apply a presumed-prejudice standard" in examining the petitioner's public trial claim). Today appears to be our first occasion to revisit this landscape in *Weaver*'s aftermath. Honoring intervening Supreme Court authority is a critical duty for any lower court, including ours. *See, e.g.*, *Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d 686, 720 (6th Cir. 2016) ("Although one panel may not disturb the ruling of a prior panel absent en banc review, an intervening Supreme Court decision gives us the right to revisit [the] question.") (citations omitted).

Turning to *Weaver*, the Supreme Court, in requiring a defendant to establish prejudice resulting from the closed proceeding, emphasized the need to balance the twin goals of fairness and finality. 137 S. Ct. at 1913. We see no reason why those same principles are not equally in play during the guilt phase. Just as much as during *voir dire*, and perhaps even more, given the time and resources invested in a trial proceeding, and given the judgment that ensues, the interest in finality is substantial, if not at its apex, following a jury verdict. *See id.* at 1912. Fairness concerns, of course, are also of critical importance during the guilt phase, and the public trial right helps ensure that judges, counsel, and witnesses alike perform properly their designated functions in the criminal justice process. *See Waller*, 467 U.S. at 46. But that is seemingly no less true for *voir dire*, which ensures the proper functioning of perhaps the most vital part of the criminal justice process, the impartial jury. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."). There is no reason to think, then, that the jury (like the judge and the parties), must not also operate under the public eye. After all, the scrupulous eyes of the public put key trial players through their paces during *voir dire* just as they do during the guilt phase. We see no sufficient distinction between

the two phases that would justify setting aside *Weaver* and imposing a different prejudice standard for public trial violations during the guilt phase.

We note one other distinction between *Weaver* and today's case. While today's case arises in a habeas posture, *Weaver* was a direct review case. That *Weaver* was decided on direct review proves all the more why Williams is not entitled to habeas relief today. If finality interests justify raising the prejudice bar when a public trial violation is couched in a claim for ineffective assistance of counsel on direct review, *Weaver*, 137 S. Ct. at 1913–14, that bar should not be any lower when we sit in collateral review of a state criminal conviction (and one over a decade old at that).

We thus hold that a criminal defendant, to satisfy the *Strickland* standard in the context of a failure to object to a potential public trial violation during the guilt phase, must show prejudice by demonstrating that, as explained in *Weaver*, but for the alleged error, there is "a reasonable probability of a different outcome in [his] case or . . . that the . . . violation was so serious as to render the trial fundamentally unfair." *Id.* at 1911. This burden, we recognize, is a heavy one. *Id.* at 1910 (noting the "difficulty" a court faces in "assessing the effect of the error" (quoting *United States v. Gonzales-Lopez*, 548 U.S. 140, 149 n.4 (2006))). And here, it is too much for Williams to bear. The vast majority of his trial took place in an open setting, transcripts were made available from the limited sessions that took place behind closed doors, and the closure had no discernable effect on the judge, counsel, or jury. In that sense, the error here "did not pervade the whole trial." *Id.* at 1913. Nor did the temporary closure "lead to basic unfairness," *id.*, in the way other structural errors have been deemed to do, for instance, where a judge is improperly biased, or where jurors are excluded on the basis of race. *Id.* at 1911 (collecting cases). In other words, much like the defendant in *Weaver*, Williams has not alleged that the jury, judge, or prosecutor "failed to approach their duties with the neutrality and serious purpose that our system demands." *Id.* at 1913.

Having forcefully advanced many arguments to this point, Williams's argument addressing the public trial violation's effect on his conviction is less persuasive. Perhaps the only evidence that might suggest prejudice to Williams is a purported affidavit from Lewis recanting his trial testimony. In that affidavit, Lewis attested that he relied largely on rumors in

testifying against Williams, and that he now believes that testimony to be false. Recantations are understandably viewed with a skeptical eye. *Matthews v. Ishee*, 486 F.3d 883, 895 (6th Cir. 2007) (citing *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991)). And that skepticism is all the more appropriate here given that the affidavit is not a part of our record, was apparently filed only in state court, and even then, was filed after the underlying district court decision here. But even accepting Lewis's claim as true, it is difficult to see how the courtroom remaining open would have done much, if anything, to remedy the earlier problem with his testimony. All of Lewis's direct examination, and part of his cross examination too, occurred in the traditional courtroom setting, fully open to the public. During that time, Lewis testified consistently that Green and Williams were the assailants in the nightclub shooting. And he said the same in the closed courtroom; Lewis's story did not change from open proceedings to closed. Having had some opportunity to change his testimony once the proceedings were held in the absence of spectators, the consistency in Lewis's testimony undercuts the idea that the closed proceedings emboldened Lewis to lie. And more to the point, to accept Williams's contention today, one would need to believe that Lewis, had he concluded his testimony in an open courtroom, would have contradicted his earlier three days of testimony. We see no evidence to that effect.

All of this, moreover, must be considered in the context of the broader evidentiary record. Setting Lewis's testimony aside, there remained substantial indicia of Williams's guilt. Chief among them, Williams had a long history of conflict with the victims, police recovered a burned minivan with a missing rear door that traced to Williams's mother, and Ware testified that Williams admitted to the crime while they were incarcerated together.

All told, we see no basis to conclude that Williams was prejudiced by the closure of the courtroom such that his procedural default should be excused. *See Weaver*, 137 S. Ct. at 1910 ("[I]n some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint."). Nor will we order the significant undertaking of an evidentiary hearing when a claim of prejudice is based on little more than speculation. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations . . . a district court is not required to hold an evidentiary

hearing."); *see also Weaver*, 137 S. Ct. at 1912 (recognizing that "the rules governing ineffective-assistance claims 'must be applied with scrupulous care'") (quoting *Premo v. Moore*, 562 U.S. 115, 122 (2011)).

\* \* \* \* \*

Williams has failed to clear *Strickland*'s high bar. That means he cannot demonstrate cause and prejudice excusing his procedural default. That also means we may not review the merits of his public trial claim. *Coleman*, 501 U.S. at 750. And as his claim for habeas relief on ineffective assistance grounds, all agree, is measured against the demanding AEDPA standard of review, it likewise fails. *See Harrington*, 562 U.S. at 102.

For these reasons, we **AFFIRM** the judgment of the district court.