Filed 9/23/21  P. v. Patterson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KIRK ANTHONY PATTERSON,<br><br>    Defendant and Appellant. | D077938<br><br><br>(Super. Ct. No. SCD277112) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers and Michael S. Groch, Judges.  Affirmed.

Bruce L. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette C. Cavalier and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

Based largely on evidence derived from a police search of a cell phone found in the possession of a 16-year-old prostitute (Precious), defendant Kirk Patterson was charged with commercial sex trafficking of a minor (Pen. Code, § 236.1, subd. (c)(1)),[1] pimping (§ 266h, subd. (a)), pandering (§ 266i, subd. (a)(2)), using a minor to pose for sex acts (§ 311.4, subd. (c)), oral copulation of a minor (§ 288a, subd. (b)(1)), and possessing child pornography (§ 311.11, subd. (a)).  Patterson moved to suppress all evidence derived from the cell phone, arguing Precious lacked authority to consent to the search, and, in any event, that her consent was not voluntary.  The court denied the suppression motion at the preliminary hearing, and Patterson's trial counsel did not renew the motion at trial.  The jury convicted Patterson of all charges pertaining to Precious,[2] and the trial court sentenced him to 10 years in prison.

On appeal, Patterson indirectly attacks the suppression ruling by asserting his trial counsel rendered ineffective assistance by failing to renew the suppression motion at trial, as required to preserve the issue for appellate review.  Because the record shows that Precious had apparent authority to consent to the search and voluntarily consented to it, the search was legally valid and it would have been futile for Patterson's trial counsel to renew the suppression motion.  Counsel did not render ineffective assistance, and we affirm the judgment.

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    The jury acquitted Patterson of similar charges pertaining to another alleged victim.  Those charges are not at issue here, and we do not discuss them.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Because Patterson's sole appellate challenge relates to the merits of his pretrial suppression motion, which we conclude was properly denied, we discuss only briefly the evidence presented at trial.

On May 9, 2018, San Diego Police Department vice detectives conducting an undercover sting operation negotiated a prostitution transaction with 16-year-old Precious. The detectives took her into custody and, because of her young age, contacted detectives with the department's Human Trafficking Task Force (Task Force). Those detectives obtained Precious's consent to search her nearby hotel room, which yielded indicia of prostitution and a Samsung cell phone. Detectives took Precious to a police station for questioning.

At the station, Precious gave detectives permission to search the Samsung cell phone and an additional cell phone—a black ZTE brand phone—she had in her possession when taken into custody. Detectives downloaded the contents of the ZTE phone and found numerous text messages with a contact named "EL" that suggested a pimp/prostitute relationship. The phone also contained a video of Precious orally copulating a male.

Using information on the ZTE phone, detectives determined "EL" was Patterson. Police took Patterson into custody during a traffic stop. In his vehicle, police recovered two cell phones, one of which contained a video of Precious exposing her vagina. After being advised of his *Miranda*[3] rights, Patterson admitted to police that he was the male being orally copulated in the video downloaded from the ZTE phone.

---

3    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Patterson was charged with commercial sex trafficking of a minor (§ 236.1, subd. (c)(1)), pimping (§ 266h, subd. (a)), pandering (§ 266i, subd. (a)(2)), using a minor to pose for sex acts (§ 311.4, subd. (c)), oral copulation of a minor (§ 288a, subd. (b)(1)), and possessing child pornography (§ 311.11, subd. (a)).

Patterson moved to suppress all evidence obtained or derived from the ZTE phone, arguing Precious lacked authority to consent to a search. The court heard and denied Patterson's motion at the preliminary hearing, and held him to answer on all charges. Patterson's trial counsel did not renew the suppression motion at trial.

The jury found Patterson guilty on all counts pertaining to Precious, and the trial court sentenced him to 10 years in prison.

## II. DISCUSSION

Patterson contends his trial counsel rendered ineffective assistance by failing to renew his suppression motion at trial, which was necessary to preserve his evidentiary challenge for appellate review. We disagree.

### A. Background

### 1. Patterson's Motion

Before the preliminary hearing, Patterson moved to suppress all evidence obtained or derived from the warrantless search of the ZTE phone. He maintained the phone was his, and that Precious lacked authority to consent to the search.

The prosecution opposed the motion, arguing Patterson lacked standing because Precious possessed and was the primary user of the phone, and, in any event, Precious consented to the search.

4

## 2. The Hearing

The trial court held a consolidated suppression and preliminary hearing at which the prosecution called three witnesses:  the vice detective who detained Precious, and the two Task Force detectives who interviewed her and searched the ZTE phone.

### (a)  Detective Zoller

Vice Detective Joshua Zoller testified that on May 9, 2018, he and another male detective were conducting an undercover sting operation in an area well-known for prostitution activity.  Detective Zoller caught Precious's attention, and she agreed to perform specified sex acts with him in exchange for money.  When Precious got into the detectives' unmarked vehicle to drive to a nearby hotel room she had rented, the detectives identified themselves as police officers and detained her.

The detectives called a female detective to search Precious.  During this search, the detectives confirmed Precious's identity and learned she was only 16 years old.  Because of the department's policy to not arrest or charge minors engaged in prostitution activity, the vice detectives summoned detectives from the Task Force.

Detective Zoller testified he did not recall whether Precious had a cell phone when he detained her.

### (b)  Detective Dierdorff

Task Force Detective Daniel Dierdorff testified that he and fellow Task Force Detective Adam Wells traveled to the La Mesa Police Department to interview Precious, who had been taken into protective custody "[t]o make sure she wasn't being pimped out."  Although she was not under arrest, the detectives advised Precious of her *Miranda* rights, which she stated she understood and waived.

5

Precious told the detectives she used methamphetamine and had been up for 32 hours. But Detective Dierdorff, who has "been trained in how to detect when someone is under the influence of methamphetamine," testified he did "not believe she was under the influence at the time [he] spoke with her."

Precious admitted she had been engaging in prostitution since she was 13, and claimed to be a "renegade" who "was her own pimp" and "works for herself and nobody else." However, Detective Dierdorff saw that she had two sets of initials ("E.L." and "V.B.") tattooed on her body, which is a common way that pimps "brand[ ]" or "mark" prostitutes as their property. When asked about these tattoos, Precious claimed they represented her mother and grandfather (although she could not recall her grandfather's last name). Detective Dierdorff testified it is very common for prostitutes to lie to protect their pimps, who train their prostitutes to do this.

During the interview, Detective Dierdorff learned that Precious had two cell phones—a white Samsung and a black ZTE. He testified about how Detective Wells, who "was responsible for handling most of the . . . phone evidence in this case," obtained Precious's consent to search the phones: "[He] basically described to Precious the options she had, that she can give us consent to look through the phones, that if consent wasn't given we can also get a search warrant for them and put it into evidence, but it was her choice what she wanted to do." Precious gave the detectives oral and written consent to search both phones.

Detective Dierdorff testified that although Precious never expressly stated the phones were hers, he believed they were and that "she was in possession of and had the privacy rights to" both of them. Under cross-examination, he acknowledged Precious "told [him] it wasn't her phone," but

6

he clarified on redirect that her comment was directed toward Detective Wells, and Detective Dierdorff was not certain whether Precious made the statement during the May 9 interview or during a subsequent call, or which phone she was referring to.

Under further cross-examination, Detective Dierdorff acknowledged that, in his experience, a 16-year-old cannot "contract for a cell phone." During this line of questioning, the trial court interjected that whether the phone was "legally" Precious's is "vague and a term of art. . . . If I give my 16-year-old daughter a cell phone it's her phone."

### (c) Detective Wells

Task Force Detective Wells testified it was his understanding that the ZTE phone was in Precious's possession when she was taken into custody, and that he took custody of it at the La Mesa Police Department. When he asked Precious if he "could look in it," she "gave consent but said 'It's dead.'" Another detective found a charging cable, and they charged the phone while the interview continued.

Detective Wells testified he obtained Precious's consent to search the cell phone by explaining they could go down one of "two paths"—"the consent path" or "the search warrant process where we collect things as evidence." Precious consented orally and in writing.[4]

Detective Wells testified he did not recall questioning Precious about who the ZTE phone belonged to, but there was "[n]o question in [his] mind that that was her phone and she was in dominion and control" of it. He explained, "My understanding was it was on her person at the time of the

---

4       The signed "Consent to Search Computer Equipment and Electronic Data" form was admitted as an exhibit at the suppression hearing, but it is not in the appellate record.

7

arrest. As we interacted between the two of us whether I could look into that phone, charge it, and the general conversation, I had no question that that was her phone and she was the one that could give me permission to look into it."

Detective Wells looked in the phone "and saw some text messages making [him] believe she may be involved in prostitution." During his initial viewing, he "saw a lot of interaction with a contact labeled 'El,' back and forth that made [him] think that there may be a trafficker involved." Precious did not mention Patterson's name during the interview or indicate he was "El."

The next day, Detective Wells downloaded the contents of the ZTE phone. Based on his review of the phone's contents, he concluded someone other than Precious (later determined to be Patterson) had possessed the phone until April 29 (11 days before the sting), and Precious possessed it from that day forward.

Detective Wells testified in detail about many text messages he saw between Precious and "El" and that "some of the content made [him] believe there was a pimp/prostitute relationship." He cross-referenced "El's" phone number against police contact records and determined the contact corresponded to Patterson.

Detective Wells acknowledged on cross-examination that Precious called him on May 23 (about two weeks after her interview) and said "she took the [ZTE] phone from Patterson," and that "he didn't give it to her." She also "denied knowing El's name." On redirect, however, Detective Wells explained that when he confronted Precious during this call with the fact "she referred to [Patterson] as 'El' and 'Kirk' in text messages," she "kind of giggled" and said, " 'Ah, shit,' as if [Detective Wells] caught her in a lie."

## (d) Arguments of Counsel

The prosecutor argued Patterson lacked standing to challenge the phone search because he "no longer ha[d] a privacy interest" in the phone since he "essentially gifted" it to Precious to keep track of her. The prosecutor also argued the detectives reasonably relied on Precious's apparent authority to consent to the search because she "was in possession of the" phone, "she was the primary user of [it] at that time," and she provided oral and written consent.

Defense counsel maintained Patterson had standing because the Supreme Court held in *Riley v. California* (2014) 573 U.S. 373 (*Riley*) that cell phone searches now require a warrant, which the detectives failed to obtain despite "easily" having "enough facts at that point to" get one. Counsel argued the detectives unreasonably relied on Precious's consent because she "never said that she owned the phone," and the detectives "didn't ask detailed questions" regarding ownership. Counsel also argued Precious's consent was "not voluntary" because she was "a minor [B]lack female" being interviewed by "two older white detectives" in a police station "interrogation room."

## (e) Ruling

The court denied Patterson's suppression motion with a detailed explanation. First, the court found there was probable cause to arrest Precious and, thus, the police "lawfully came into possession of [the ZTE] phone."

Second, although the court's "sense" was that Patterson "d[id]n't have standing" to challenge the search, the court stated it would "assume that he does for purposes of this analysis."

Third, the court addressed two aspects of consent—whether it was (1) "free and voluntary," and (2) given "by one who was authorized or who reasonably appeared to be authorized to give [it]."

Regarding voluntariness, the court "d[id]n't see any indication of the [detectives] overreaching and overbearing [Precious's] free will." To the contrary, she "was totally responsive to their questions . . . in a pimp-protecting way," and had "no hesitation" objecting to the detectives' theory that she was working for a pimp.

Regarding apparent authority, the court found that Precious's denial of working with a pimp "was a pretty compelling argument that this was her cell phone." The court acknowledged the detectives "might *speculate* that it's a pimp who gave this phone to her, but it sure comes across as her phone, and she's denying to them that there was such a third person." (Italics added.) The court asked rhetorically, "What would any of us think? We'd think that this was her cell phone." The court thus concluded Precious "ha[d] a sufficient possessory interest [in the phone], and . . . it [was] reasonable for the officers to believe that she had authority to give consent."

Accordingly, the court denied Patterson's suppression motion and held him to answer on all charges.

### 3. Post-Ruling Proceedings

A few months after the suppression/preliminary hearing, Patterson substituted new counsel. It is undisputed that although his new counsel filed additional suppression motions, none of them relitigated the search of the ZTE phone that Patterson challenges here.

### B. Legal Principles

A defendant whose suppression motion is denied at a preliminary hearing ordinarily must renew the motion before the trial court to preserve

the challenge for appellate review. (*People v. Lilienthal* (1978) 22 Cal.3d 891, 896); *People v. Hart* (1999) 74 Cal.App.4th 479, 485 (*Hart*); *People v. Hoffman* (2001) 88 Cal.App.4th 1, 3; *People v. Witcraft* (2011) 201 Cal.App.4th 659, 666 (*Witcraft*).)

However, if the defendant claims the failure to renew the suppression motion was the result of ineffective assistance of counsel, the appellate court must review the merits of the suppression motion to determine whether counsel performed deficiently and, if so, whether that deficient performance prejudiced the defendant. (*Hart, supra*, 74 Cal.App.4th at p. 486; see *People v. Caro* (2019) 7 Cal.5th 463, 488 (*Caro*); *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301 ["To establish ineffective assistance of counsel [under *Strickland v. Washington* (1984) 466 U.S. 668], a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant."].)

If the suppression issue has merit, "failing to preserve the issue constitute[s] deficient performance when measured against the standard of a reasonably competent attorney." (*Hart, supra*, 74 Cal.App.4th at pp. 486-487; see *Witcraft, supra*, 201 Cal.App.4th at p. 666.)

If, on the other hand, the suppression issue lacks merit, counsel did not render ineffective assistance by failing to preserve it because "[a] decision not to pursue futile or frivolous motions does not make an attorney ineffective." (*People v. Bell* (2019) 7 Cal.5th 70, 126; see *Caro, supra,* 7 Cal.5th at p. 488 [same].)

## C. Analysis

Assuming without deciding that Patterson has standing to challenge the warrantless search of the ZTE phone, we conclude his challenge lacks merit, and thus his trial counsel was not ineffective.

Warrantless searches " ' "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." ' " (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041.) "[An] established exception . . . is when consent is given by one *authorized* to give it." (*People v. Superior Court* (*Chapman*) (2012) 204 Cal.App.4th 1004, 1011, italics added; see *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219.) Additionally, consent must be *voluntary* to be valid. (*People v. Boyer* (2006) 38 Cal.4th 412, 445 (*Boyer*).) We will address authority and voluntariness in turn.

But first, we address Patterson's intimation that, because the Supreme Court recognized in *Riley, supra*, 573 U.S. 373 that "cell phones . . . implicate privacy concerns far beyond those implicated by the search of" other types of property (*id.* at p. 393), the consent exception to the warrant requirement no longer applies to cell phones. We disagree. *Riley* held only that the search incident to arrest exception does not apply to cell phones; it did not hold that other well-established exceptions no longer apply. (*Id.* at pp. 401-402 ["even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone"]; see *United States v. Gardner* (6th Cir. 2018) 887 F.3d 780, 783-784 [holding that even though "cell phones have become singular instruments with singular importance to many people," the "third-party consent exception to the warrant requirement applies to cell phones all the same"; thus, minor prostitute's consent to search cell phone shared with pimp

12

was valid]; *United States v. Truong Son Do* (N.D.Okla. 2014) 62 F.Supp.3d 1236, 1248 ["[c]onsent is a recognized exception to the warrant requirement" even after *Riley*]; *Zuegel v. Mountain View Police Department* (N.D.Cal. Apr. 19, 2018, No. 17-cv-03249-BLF) 2018 WL 1876948, at *7, fn. 9 [finding "*Riley* inapposite" to search of cell phone based on owner's consent].)

## 1. Precious Had Apparent Authority to Consent to the Search

Valid consent to search may be given by (1) the person whose property or place is searched, (2) a third party who possesses common authority over that property or place, or (3) "a person with apparent authority where the officers conducting the search reasonably believe that the person is empowered to give that consent." (*People v. Superior Court* (*Walker*) (2006) 143 Cal.App.4th 1183, 1198-1199 (*Walker*); see *Illinois v. Rodriguez* (1990) 497 U.S. 177, 188 [the "determination of consent . . . must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises?"].) We will address only apparent authority because that is the basis on which the trial court denied Patterson's motion.

Courts have applied different review standards to the determination of whether an officer's belief was reasonable. (Compare *People v. Douglas* (2015) 240 Cal.App.4th 855, 869 [substantial evidence]; with *People v. Carreon* (2016) 248 Cal.App.4th 866, 876 [de novo review as "a question of law"].) Under any standard, we conclude it was reasonable for Detectives Dierdorff and Wells to believe Precious had the authority to consent to a search of the ZTE phone.

When the detectives began interviewing Precious, they were aware she had the ZTE phone in her possession when she was taken into custody.

13

When Detective Wells asked if he "could look in" the phone, Precious's response was not "it's not mine," it was words to the effect of "yes, but it's not charged." It appears from the record that she was aware the detectives found a charging cable and were charging the phone while they continued to interview her. The detectives then obtained Precious's oral and written consent before actually searching the phone. Both detectives testified they believed the phone belonged to Precious.

Patterson suggests that based on the detectives' experience investigating human trafficking, observation of Precious's tattoos, and understanding that minors cannot enter into contracts for cell phones, they should have inferred she was working for a pimp, and *further* inferred the cell phone belonged to that pimp. We find this ultimate inference too speculative. Precious repeatedly denied she worked for a pimp, she maintained her tattoos were tributes to her mother and grandfather, and the detectives had not yet seen the text messages that suggested a pimp/prostitute relationship. Additionally, the trial court correctly observed that the legal question of whether a minor can contract for a cell phone does not alter the practical reality that many teenagers possess and control cell phones. (See, e.g., *United States v. Matlock* (1974) 415 U.S. 164, 171, fn. 7 [explaining, in the related context of obtaining consent from a third party with "common authority" over the property to be searched, that authority to consent is not derived from "the law of property, with its attendant historical and legal refinements"].)

Patterson also argues the detectives "conveniently glossed over" Precious's statement during the interview "that the phone wasn't hers." The record is not so clear on this point. Although Detective Dierdorff initially testified on cross-examination that Precious made such a statement, he

14

clarified on redirect that he was not certain she made the statement during the interview or which phone she was referring to. He also clarified that Precious's statement was directed to Detective Wells, who was in charge of the cell phone aspect of the investigation.

For his part, Detective Wells testified he did not recall Precious making such a statement *during the interview*, but he recalled her making such a claim *a few weeks later*. He also explained that he caught Precious in a lie during this phone conversation.

This cold record does not support Patterson's assertion that Precious unequivocally stated during the interview that the cell phone was not hers. Rather, the record as a whole suggests she was silent on the issue during the interview, such that it was reasonable for the detectives to conclude from her other statements and conduct that she had apparent authority to consent to the search.

## 2. Precious's Consent Was Voluntary

"The voluntariness of consent is a question of fact to be determined from the totality of circumstances. [Citations.] If the validity of a consent is challenged, the prosecution must prove it was freely and voluntarily given— i.e., 'that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority.' " (*Boyer*, *supra*, 38 Cal.4th at pp. 445-446; see *People v. Harris* (2015) 234 Cal.App.4th 671, 689-690.) Voluntariness " 'is to be determined in the first instance by the trier of fact; and in that stage of the process, "[t]he power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence." ' " (*People v. Monterroso*

15

(2004) 34 Cal.4th 743, 758 (*Monterroso*); see *People v. Balov* (2018) 23 Cal.App.5th 696, 701.) We conclude substantial evidence supports the trial court's factual finding that Precious's consent was voluntary.

The detectives advised Precious of her *Miranda* rights before questioning her, which "tend[s] to show that" her subsequent "consent was voluntary." (*People v. Sloss* (1973) 34 Cal.App.3d 74, 84 (*Sloss*); see *People v. Ratliff* (1986) 41 Cal.3d 675, 686 (*Ratliff*) ["the failure to give *Miranda* warnings does not render a consent to search involuntary"].)

Detective Wells also expressly requested Precious's consent. "[S]uch a request, by its nature, carries the implication that permission may be withheld." (*People v. Ledesma* (2006) 39 Cal.4th 641, 704; see *People v. James* (1977) 19 Cal.3d 99, 116.) The fact Detective Wells told Precious he would seek a search warrant if she refused to consent does not render her consent involuntary. (*Ratliff, supra*, 41 Cal.3d at p. 687 ["The trial court was . . . entitled to conclude that" officers' "threat[ ] to secure a search warrant . . . unless defendant consented to a search" was "merely . . . a declaration of the officers' legal remedies should defendant refuse to cooperate"].)

Additionally, as the trial court observed, the detectives' preliminary hearing testimony showed Precious "was totally responsive to their questions . . . in a pimp-protecting way," and had "no hesitation" objecting to the detectives' theory that she was working with a pimp. This supports the trial court's findings that the detectives were not "overreaching" or "overbearing [Precious's] free will," and that her consent was free and voluntary.

None of Patterson's contentions to the contrary are persuasive. For example, although Precious told the detectives she was on methamphetamine

16

and had been up for 32 hours, Detective Dierdorff testified that, based on his training and experience, he did "not believe she was under the influence at the time [he] spoke with her." The trial court was entitled to credit this testimony. (*Monterroso, supra*, 34 Cal.4th at p. 758.) And, in any event, "the mere fact that one has taken drugs, or is intoxicated, . . . does not render consent involuntary." (*United States v. Rambo* (8th Cir. 1986) 789 F.2d 1289, 1297; see *United States v. George* (9th Cir. 1993) 987 F.2d 1428, 1430-1431 [consent was voluntary even when the defendant was recovering in the hospital from a drug overdose].)

Patterson also cites the fact that Precious was a young, Black female being questioned alone at a police station by two adult, White, male detectives. While potentially relevant, none of these factors compelled the trial court to find her consent involuntary. (See, e.g., *People v. Hoxter* (1999) 75 Cal.App.4th 406, 413-414 [finding that police officers' "belief that [a 16-year-old] had apparent authority to provide them consent to enter her home was made in good faith and was eminently reasonable under the circumstances"]; *Sloss, supra*, 34 Cal.App.3d at p. 84 ["The fact that a number of officers were present does not render the consent involuntary if they engaged in no threatening or coercive conduct."]; *United States v. Mendenhall* (1980) 446 U.S. 544, 558 ["It is additionally suggested that the [defendant, a 22-year-old Black female who never completed high school], may have felt unusually threatened by the officers, who were [W]hite males. While these factors were not irrelevant [to determining the voluntariness of her consent], [citation], neither were they decisive"].)

17

## D.  Conclusion

In sum, because we conclude that the trial court properly denied Patterson's suppression motion, such that it would have been futile for his trial counsel to have renewed it, the failure to renew the motion did not constitute ineffective assistance.

## DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.