RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL TAYLOR GARDNER,

*Defendant-Appellant.*

No. 17-1672

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cr-20135-1—Gershwin A. Drain, District Judge.

Decided and Filed: April 16, 2018

Before: BATCHELDER, SUTTON, and WHITE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Phillip D. Comorski, Detroit, Michigan, for Appellant. Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

SUTTON, Circuit Judge. Michael Gardner shared a cell phone with his seventeen-year-old girlfriend, B.H., to facilitate her "sex dates" with other men. When one of B.H.'s clients turned out to be an undercover officer, she agreed to let police search the phone. A jury convicted Gardner of trafficking a minor for sex and producing child pornography, primarily based on evidence recovered from the phone. On appeal, Gardner urges us to vacate his

convictions on the ground that the district court erroneously admitted the phone evidence during the trial, among other alleged errors. We decline the invitation and affirm.

I.

As a senior in high school, Gardner met B.H., then a freshman, and they became friends for a time. Three years later, they reconnected. The relationship became intimate, and more. On at least one occasion, Gardner used his iPhone to film them having sex. Before long, Gardner pressured B.H. to have sex with other men for money. She was seventeen years old, and Gardner knew it.

In August 2015, Gardner began posting advertisements for sex with B.H. on Backpage.com, inviting potential customers to call or text her to arrange "dates" and listing Gardner's phone number. Gardner posted more than thirty advertisements for B.H., often attempting to attach explicit pictures of her that website administrators removed. Only Gardner posted the ads. But both Gardner and B.H. exchanged texts with customers to arrange details. When customers called, Gardner handed his phone to B.H. and told her to use the speakerphone so that he could hear the price. Gardner arranged the transportation for B.H.'s liaisons and gave her drugs to endure them. At the end of each encounter, he demanded the money the clients had paid her. The two of them usually stayed the night at motels, living out of the rooms where B.H. had liaised with clients. On days when B.H. "told him that [she] didn't want to do anything," Gardner got angry. R. 106 at 29. More than once he put his hands around her throat, warning that "he could hurt [her] really bad" and get away with it. *Id.* at 30.

Business started as usual on October 10, 2016. Gardner posted an ad for B.H. on Backpage.com. A customer called Gardner's phone in response to the ad. B.H. answered and arranged the time, the place, and the price. Gardner asked his cousin to drive them to a Red Roof Inn for the "trick." When they arrived, Gardner handed B.H. his phone and told her to call him after she was done. Gardner parked across the street and waited.

Once in the motel room, the customer told B.H. that he was an undercover officer. He alerted task force officers, who entered the room, secured the premises, and spoke with B.H. Inside they found a white iPhone on a dresser next to B.H.'s purse. B.H. said it was hers, agreed

to let the officers search it, and provided the passcode. Meanwhile, a separate group of officers approached Gardner and his friends in the parked car. They asked Gardner if he had a phone. He said that he did, a black cell phone somewhere "in the back seat of the car." R. 104 at 106. Officers never found it. They took B.H. and Gardner to the police station for interviews and released them that night.

A few days later, B.H. agreed to move to Kentucky with Gardner to live with him and his mother. Pregnant, B.H. hoped that the two of them "were going to be able to start over" and that she wouldn't have to do any more "dates." R. 106 at 82. But within a week, Gardner pressured her to turn more tricks and became violent when she refused. B.H. left. She walked for an hour before someone picked her up and helped her return home to Detroit.

A grand jury indicted Gardner. Count 1 charged him with trafficking a minor for sex. 18 U.S.C. § 1591(a)(1). Count 2 charged him with producing child pornography. *Id.* § 2251(a). Before trial, Gardner asked the district court to suppress any evidence from his phone because officers seized it in violation of the Fourth Amendment and to exclude any photographs showing his gang affiliation. The district court denied both motions. It ruled that B.H. consented to let officers search the phone and that she had actual and apparent authority to do so. And it ruled that the photographs were relevant to show an element of the sex trafficking charge—whether B.H. feared that Gardner would cause her "serious harm" if she refused to prostitute herself. *Id.* § 1591(e).

The jury found Gardner guilty on both counts, and the court sentenced him to concurrent 240-month sentences.

## II.

*Motion to Suppress.* Gardner argues that the district court should have suppressed his phone because B.H. lacked apparent authority to consent to a warrantless search. But to prevail on appeal, Gardner needs to show that B.H. lacked actual authority too. He does not even try to do so. That is a mistake because we "review[] judgments, not opinions." *Texas v. Hopwood*, 518 U.S. 1033, 1034 (1996). Even if we found that B.H. lacked apparent authority, that would not necessarily suffice to alter the judgment. That possibility is not hard to imagine. Officers

could obtain information at the scene that initially suggests a lack of apparent authority (the woman says the phone is her brother's and she stole his passcode) and obtain more information later that establishes actual authority (the woman admits that she lied and the phone is hers). *See Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990). Gardner forfeited any challenge to the court's suppression ruling.

Gardner would lose the argument anyway. We appreciate that cell phones have become singular instruments with singular importance to many people, maybe most people. *Riley v. California*, 134 S. Ct. 2473, 2484 (2014). But the third-party consent exception to the warrant requirement applies to cell phones all the same, just like other essential "effects" protected by the Fourth Amendment. *United States v. Matlock*, 415 U.S. 164, 171 (1974).

The question, then, is whether a reasonable officer could believe that B.H. had authority over the phone based on the facts available to them at the time. *Rodriguez*, 497 U.S. at 188. We think so. Consider all of the information that points in that direction. B.H. used the phone to speak with the customer. She used it throughout the day to arrange the details of the get-together. She had the phone, and only that phone, in her possession during the date. She knew the phone's passcode. And she gave it to the officers. Any reasonable officer would have thought B.H. controlled the phone. *See United States v. Wright*, 838 F.3d 880, 887–88 (7th Cir. 2016) (desktop computer); *United States v. Thomas*, 818 F.3d 1230, 1241–42 (11th Cir. 2016) (same).

Gardner offers a few rejoinders. Each fails.

The officers, he says, should have known he owned the phone or at least inquired further because he didn't have a phone when they encountered him outside. But when officers asked him where his phone was, Gardner told them his "black cell phone" was somewhere in his cousin's car. R. 104 at 106. Nothing he said put officers on notice that the white iPhone in the motel room was his.

Even if that is the case, Gardner adds, B.H. was too frightened to consent voluntarily. He points out that she initially gave officers a fake name and that Detective Shock threatened to get a warrant if she did not consent. But the apprehension of "get[ting] in trouble" presents itself in

*every* consent-to-search investigation into illegal conduct. R. 60 at 18. Plus, Shock did not engage in any improper conduct or otherwise bend her will. *See United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998). B.H. acted voluntarily.

Gardner separately claims that B.H. told the officers that her boyfriend owned the phone. That's not what the arresting officers remember. But even if this were true, B.H. by all reasonable appearances had "*joint* access or control." *Matlock*, 415 U.S. at 171 n.7 (emphasis added). Because consent to search "does not rest" exclusively "upon the law of property," that is all that matters. *Id.*

*Motion in Limine.* Over Gardner's objection, the trial court admitted photographs of him brandishing guns and displaying his membership in the Traveling Vice Lords, a violent Detroit gang. Gardner still objects, claiming that the photographs were irrelevant and unduly prejudicial to boot. He is wrong. As to relevance, the government needed to prove that Gardner coerced B.H. into engaging in commercial sex by threatening her with "serious harm." 18 U.S.C. § 1591(a), (e)(2)(B), (e)(4). B.H.'s testimony that she saw the photographs had a "tendency to make [it] more or less probable" that she believed Gardner was the kind of person who would harm her. Fed. R. Evid. 401(a). As to prejudice, the district court permissibly ruled that the photographs would not cause "unfair prejudice." Fed. R. Evid. 403. At this point in the trial, the jury would not have had tender eyes, easily shocked by images not seen every day. After all, they saw other evidence that "had far greater inflammatory potential," like the video of Gardner smacking B.H. while he had sex with her. *United States v. Mandoka*, 869 F.3d 448, 459 (6th Cir. 2017). And the district court carefully circumscribed the evidence, admitting only photographs that B.H. had seen during and around the prostitution. No abuse of discretion occurred.

*Rebuttal Evidence.* Gardner argues that the district court abused its discretion by permitting the government to call Orin King in rebuttal when it could have called him during its case in chief. But he barks up the wrong tree. A party's opportunity to introduce rebuttal evidence "is not limited by the fact that [it] could have introduced the proffered evidence in [its] case-in-chief." *United States v. Caraway*, 411 F.3d 679, 683 (6th Cir. 2005). The government called King for a permissible reason—"to rebut new evidence . . . proffered in the defendant's case-in-chief." *Id.* (quotation omitted). Once on the stand, Gardner suggested for the first time

that his only involvement in B.H.'s prostitution was encouraging her to stop because he "didn't approve of it." R. 107 at 16. In response, King explained that he had met Gardner in prison, where Gardner told him: that Gardner knew B.H. was seventeen; that he began a sexual relationship with her to encourage her to prostitute herself; that he posted ads for her on Backpage.com; that he directed his cousin to steal her phone; that he monitored her calls; that on October 10, he arranged travel to her date, gave her his phone to use, and parked across the street to wait for her; and that he pressured her to begin prostituting again after they moved to Kentucky. All of this was permissible rebuttal evidence. And the government had ample justification to introduce it after Gardner's testimony opened wide the door to its relevance.

*Sufficiency of the Evidence.* Gardner claims that insufficient evidence supports the jury's verdict on Count 2 because the government failed to show that the pornographic video crossed state lines. But a forfeiture hangs over the argument. Although Gardner moved for a judgment of acquittal after the government's case-in-chief, he did not renew the motion after his own. *See United States v. Penney*, 576 F.3d 297, 315 (6th Cir. 2009). Gardner errs in making the argument even now in any case. The statute does not require the government to show that the depiction crossed state lines. It suffices that the "visual depiction was produced . . . using materials that have been mailed, shipped, or transported in . . . interstate or foreign commerce." 18 U.S.C. § 2251(a). Gardner proved this element himself by stipulating that his iPhone had been manufactured in China.

We affirm.