NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0275n.06

No. 21-3566

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff - Appellee, | ) | Jun 25, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| ISMAIL SALAAM, | ) | |
| Defendant - Appellant. | ) | OPINION |
| | ) | |
| | ) | |

Before: COLE, CLAY, and BLOOMEKATZ, Circuit Judges.

BLOOMEKATZ, J., delivered the opinion of the court in which COLE, J., joined. CLAY, J. (pp. 20–27), delivered a separate dissenting opinion.

BLOOMEKATZ, Circuit Judge. Police twice found Ismail Salaam in a hotel room with a 16-year-old girl known in the record as J.B. The first time, the police returned J.B. to her mother. But J.B. ran away and ended up back at the same hotel with Salaam two days later. The second time, the police arrested J.B. and Salaam. At first, the police thought Salaam was only harboring J.B. as a runaway and contributing to her delinquent behavior. Eventually, J.B. told the investigating officers that Salaam had taken nude pictures and videos of her on her iPhone. Worse yet, she told them that Salaam arranged for other men to have sex with her. Based on that information, the officers seized three cell phones from Salaam, including J.B.'s iPhone. J.B. then opened her iPhone for the officers, and they uncovered evidence of Salaam's sexual exploitation of J.B. The police later obtained warrants to search the three phones and the hotel room.

Salaam was indicted for one count of sex trafficking a minor and two counts of production of child pornography. A jury convicted Salaam on all three counts, and the district court sentenced him to 480 months in prison. On appeal, Salaam raises a bevy of constitutional, evidentiary, and sentencing challenges. We conclude that none give rise to reversible error and affirm Salaam's conviction and sentence.

## FACTUAL BACKGROUND

J.B. met Salaam in August 2016 after she ran away from a troubled home life. At the time, Salaam was 34, and he knew that J.B. was only 16.

Soon after they met, J.B. began staying some nights each week with Salaam in his apartment. The second time she spent the night with him, Salaam gave J.B. Hennessy spiked with "molly." While J.B. was intoxicated, Salaam recorded a video of her in the shower and encouraged other men at the apartment to have sex with her.

J.B. later moved in with Salaam. That's when Salaam began encouraging J.B. to engage in prostitution and introduced her to Backpage.com, a now-defunct classified ad forum that was an infamous marketplace for illicit commercial sex. Salaam paid for J.B.'s hairstyling and nail treatments and got her glasses to make her look older for the Backpage.com advertisement.

Salaam got evicted about two weeks after J.B. moved in, so they moved to a hotel room in Springdale, Ohio. Salaam had his son with them at first, but when Salaam "got rid of his son," J.B. knew Salaam wanted her to do "[s]tuff for Backpage." Trial Tr., R. 95, PageID 799. Salaam shot illicit pictures and videos of J.B. on her iPhone and posted them on Backpage.com. Salaam also texted J.B. on her iPhone about prostitution and used J.B.'s iPhone to communicate with potential clients. He specifically told other men not to text J.B.'s iPhone unless they would pay to have sex

with her, and he became angry with J.B. when she didn't initiate sex during one of his arrangements.

Several weeks after Salaam began prostituting J.B., one of Salaam's contacts paid $100 to have sex with J.B. in an abandoned apartment building. After that, J.B. told Salaam that she "didn't want to do the Backpage stuff no more." *Id.*, PageID 806. Salaam retaliated by choking her, pulling her hair, and threatening to leave her bloody in the hotel room.

During this physical incident, J.B. called her mother, first with her iPhone and then with the phone in the hotel room. Soon after, the Springdale police arrived, followed by J.B.'s mother. The police allowed Salaam to talk with J.B., and he instructed her to come right back to the hotel after departing with her mother. That's what she did. But a few days later, Salaam and J.B. had another explosive conflict, and the hotel staff summoned the police again. They both were caught trying to run from the police, arrested, and transported to the station in separate cars.

The officers were concerned that the 34-year-old Salaam had twice been caught with a 16-year-old runaway in a hotel room. When the officers first questioned J.B. about her relationship with Salaam, she lied to them about who she was and what she was doing with Salaam. After the officers built a rapport with her at the station, however, J.B. began to give details of her relationship with Salaam. J.B. told the officers that she was familiar with Backpage.com, that Salaam had her iPhone, and that there were illicit images on that device. By the time the officers learned of the pornographic images on J.B.'s iPhone, Salaam had been booked on state charges for contributing to the delinquency of a minor and harboring a runaway and had not yet been released.

Having learned about J.B.'s iPhone, one of the officers approached Salaam in the booking area and told him they needed to hold onto the three phones he was carrying, including J.B.'s iPhone. Salaam put up a brief protest but surrendered the phones after he closed out of some

accounts and locked the iPhone. The officer took the iPhone to J.B., and she unlocked it with her finger and gave the officers her consent to search the device. Illicit images and videos were on the iPhone, consistent with J.B.'s statements. The officers then obtained search warrants for the hotel room, J.B.'s iPhone, and Salaam's Samsung and Huawei cell phones.

## PROCEDURAL HISTORY

We recite the procedural history relevant to Salaam's various challenges, which stretch from suppression to sentencing.

The government filed a criminal complaint against Salaam on September 28, 2016. Salaam appeared in court with his appointed attorney the next day. A grand jury indicted Salaam on October 11, 2016.

Following the charging stage, Salaam contacted J.B. and her mother while he was in custody at the Butler County Jail. In response, the district court issued no-contact and protective orders on motions from the government. Salaam later violated those orders by using an unnamed third party to deliver a letter to J.B. instructing her to "stay out of the way" of the criminal case against him. PSR ¶ 79.

Salaam moved to suppress the evidence gathered from the hotel room and the three phones the officers took from him at the police station. On April 5, 2018, the court held a preliminary hearing on Salaam's motion. At that hearing, the parties only addressed Salaam's standing to suppress the evidence gathered from J.B.'s iPhone. After that first hearing, Salaam supplemented his motion to suppress and later moved for a decision on the motion. On August 1, 2018, the district court held a second hearing to address the remaining suppression issues, including the evidence obtained from the other two phones. At the second hearing, the court ruled that Salaam lacked Fourth Amendment standing to assert a privacy interest over J.B.'s iPhone. The district court also

denied the motion to suppress the evidence from the other two phones, concluding that the officers had lawfully searched the phones incident to Salaam's arrest.

The district court also confronted several pre-trial issues regarding Salaam's counsel. During the pendency of his motion to suppress, Salaam expressed a desire for new appointed counsel. The court held a hearing on Salaam's motion for new counsel on February 7, 2018, and, after an ex parte discussion that included the court and his lawyer, Salaam expressed his desire to continue the representation and withdrew his request. Six months later, the district court was concerned that the case was too complex for Salaam's first appointed attorney to try on his own, so it appointed Salaam an additional attorney.

At trial, the government called J.B. to testify. She detailed her interactions with Salaam from their first meeting through their arrests at the hotel. J.B. testified about her text conversations with Salaam and the illicit images and videos that he took of her. Her recounting of the facts was supported by testimony from the investigating officers and the FBI agent on the case.

The district court closed the courtroom to the public during J.B.'s testimony because it involved displaying the pornographic images and videos of J.B. when she was a minor. The government never asked the court to take that action and Salaam did not object at the time. Later in the trial, an FBI agent testified further about the pornographic evidence. This time, Salaam objected to a closed courtroom. With agreement from the parties, the district court did not exclude the public from the courtroom but turned off certain monitors to block the illicit material from the gallery's view.

The jury found Salaam guilty of one count of sex trafficking of a minor and two counts of producing child pornography. After his conviction and the filing of his sentencing memorandum, Salaam moved to represent himself at sentencing. The district court granted Salaam's request to

proceed pro se after engaging in a *Faretta* colloquy, and it appointed his first appointed attorney as standby counsel. The district court subsequently sentenced Salaam to 480 months in prison. This appeal followed.

## ANALYSIS

### I.     The cell phone evidence.

Salaam claims that the police violated his Fourth Amendment rights when they obtained J.B.'s iPhone from his possession and took it to J.B. who unlocked it, revealing incriminating evidence against him. Salaam further argues that the police unlawfully seized his Samsung and Huawei cell phones. We review the district court's denial of Salaam's motion to suppress the cell phone evidence for clear error on its factual findings and de novo on its legal conclusions. *United States v. Waide*, 60 F.4th 327, 335 (6th Cir. 2023). We may consider the trial evidence, as well as the suppression hearing evidence, and may affirm on any ground supported by the record. *United States v. Gill*, 685 F.3d 606, 609 (6th Cir. 2012).

### A.     The iPhone evidence.

Salaam's motion to suppress the evidence from the iPhone fails because J.B. consented to the search of that device. *See United States v. Gardner*, 887 F.3d 780, 783–84 (6th Cir. 2018). In cases where there is a joint interest in property, it is well established that any of the persons with such an interest can consent to a search. *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)). There is no question that J.B. had a privacy interest in her own phone, and Salaam himself called it "a both-of-us-type phone." Salaam Testimony, R. 60, PageID 597, 601. We doubt that Salaam had a legitimate privacy interest in J.B.'s iPhone, but even if he did, he does not contest that J.B. validly consented to a warrantless search. That alone is enough to resolve the search of her phone. *See Gardner*, 887 F.3d at 783–84.

> **B.** **The Samsung and Huawei cell phone evidence.**

Salaam challenges the district court's finding that his Samsung and Huawei cell phones were seized incident to his arrest. Because this argument challenges the district court's factfinding, we review for clear error only. *United States v. Loines*, 56 F.4th 1099, 1105 (6th Cir. 2023). Under this standard, to reverse we would have to be sure that Salaam wasn't under arrest when he turned over his cell phones. The record evidence does not support such a conclusion.

Salaam was originally arrested for interference with custody and contributing to the delinquency of a minor. The police transported him to the station and booked him for those offenses. But when J.B. told the arresting officers that Salaam made nude videos and images on her phone and prostituted her out in the hotel room, the police became worried about more serious offenses. Even under Salaam's version of the story, he wasn't free to leave when J.B. implicated him for sexually exploiting her and the officer approached him to obtain the phones. Accordingly, we will not disturb the district court's finding that Salaam was under arrest when the police obtained his phones. *See Loines*, 56 F.4th at 1105.

## II. The Speedy Trial Act

We review the district court's interpretation of the Speedy Trial Act de novo and its factual findings for clear error. *United States v. Sobh*, 571 F.3d 600, 602 (6th Cir. 2009).

Salaam's 70-day speedy-trial clock started on October 11, 2016 with his indictment. *See* 18 U.S.C. § 3161(c)(1). On appeal, Salaam relies on the mistaken presumption that the clock started 21 days prior to his indictment with his initial appearance on September 29, 2016. The 21-day difference between Salaam's incorrect speedy trial calculation (starting with the date of his initial appearance) and a correct speedy trial calculation (starting with the date of his indictment) takes the number of countable days from 84 to 63—under the 70-day limit specified in the Act. *Id.*

Therefore, Salaam cannot show a violation of the Speedy Trial Act counting from the date of his indictment, even if we were to accept his other Speedy Trial Act arguments. So we affirm without resolving them.

### III.    The Courtroom Closure

Salaam argues that the district court violated his Sixth Amendment right to a public trial when it closed the courtroom to prevent the public from viewing the child pornography evidence while J.B. testified.

As an initial matter, we must decide the applicable standard of review. The right to a public trial is a "fundamental aspect of criminal trial proceedings" that is enshrined in our Constitution. *Williams v. Burt*, 949 F.3d 966, 977 (6th Cir. 2020). At the same time, however, a public-trial challenge is subject to the preservation requirement from the Rules of Criminal Procedure. *United States v. Williams*, 974 F.3d 320, 340 (3d Cir. 2020) (citing *Puckett v. United States*, 556 U.S. 129, 134 (2009)). To satisfy this preservation requirement, Salaam had to advance a contemporaneous objection to the courtroom closure so that the district court could address the public-trial issue. *See Puckett*, 556 U.S. at 134–35; *United States v. Ruiz*, 403 F. App'x 48, 51 (6th Cir. 2010) (explaining that a timely objection gives the trial judge an opportunity to cure its error).

Salaam never objected. To begin, Salaam didn't object when the district court raised courtroom closure in the leadup to trial. During the final pre-trial conference, the court indicated that it was "leaning toward just asking the gallery to clear" while the government presented the pornographic videos to the jury. R. 148, PageID 1221–22. The government said, "that's fine," and Salaam's counsel said nothing. *Id.* Contrary to Salaam's argument, the "pertinent pages" of the trial record that he asks us to review do not contain an objection either. Appellant's Reply at 7 (citing Trial Tr., R. 149, PageID 1403–04). Right before J.B. took the stand, the government

warned that it would be showing child pornography and reminded the court that it "had previously discussed clearing out the gallery" during this evidence. R. 149, PageID 1403. During the district court's subsequent colloquy with counsel, both parties indicated that they "would be okay with going forward" *without* clearing the gallery. *Id.* After a short break in the proceedings, the district court announced its decision to close the courtroom. Salaam's trial counsel acquiesced without any hint of objection. In short, Salaam did not invoke his public-trial right in the critical period before J.B. took the stand. *See United States v. LeBlanc*, 612 F.2d 1012, 1014 (6th Cir. 1980). And we reject his contention that agreeing to go forward *without* clearing the courtroom amounts to an objection to its closing.

Even without a timely objection, however, we may still consider Salaam's public-trial challenge because that fundamental right falls among a category of "forfeited-but-reversible" issues. *United States v. Olano*, 507 U.S. 725, 731–32 (1993). But our review is for plain error. *Williams*, 974 F.3d at 340; *see also Burt*, 949 F.3d at 973 (discussing a state court's application of the plain-error standard to an unpreserved public-trial claim on direct appeal). Accordingly, Salaam must establish "(1) error, (2) that is plain," (3) that affected a substantial right, and (4) had a serious effect on the "fairness, integrity[,] or public reputation of judicial proceedings." *United States v. Doxey*, 833 F.3d 692, 709 (6th Cir. 2016) (citing *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)). Salaam's public-trial challenge satisfies the first three factors, but not the fourth.[1]

---

[1] The government argues that Salaam waived (rather than forfeited) his public-trial challenge when he didn't object to the temporary courtroom closure. We agree that Salaam didn't preserve his public-trial challenge. But nothing in the record supports the conclusion that Salaam voluntarily relinquished his public-trial right such that our waiver doctrine would entirely foreclose this aspect of his appeal.

**A.     The public-trial error was plain and affected Salaam's substantial rights.**

The public-trial right "promote[s] the interests of fairness, accuracy, and transparency for the defendant, and for the public more broadly." *Burt*, 949 F.3d at 977. Denying the right to a public trial results in a "great . . . societal loss," which is why courts are required to apply a strict standard known as the *Waller* test before closing the courthouse doors. *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) (citation omitted). The *Waller* test consists of the following elements: (1) the party seeking to close the courtroom "must advance an overriding interest"; (2) "the closure must be no broader than necessary to protect that interest"; (3) the court "must consider reasonable alternatives to closing" the courtroom; and (4) the court "must make findings adequate to support the closure." *Id.* (quoting *Waller v. Georgia*, 467 U.S. 39, 48 (1984)).

We conclude that the district court plainly erred because it did not make the required findings before temporarily closing the courtroom to the public. No party asked for the closure. And when the district court announced its closure decision, it stated "I'm required by law to clear the courtroom of anyone before the presentation of the evidence," without any further explanation. Trial Tr., R. 149, PageID 1403–04; *see Presley v. Georgia*, 558 U.S. 209, 215–16 (2010). Such a cursory declaration is insufficient to satisfy the *Waller* test.

The district court's *Waller* error affected Salaam's substantial rights. Again, the public-trial right is "a fundamental aspect of criminal trial proceedings." *Burt*, 949 F.3d at 977; *Weaver v. Massachusetts*, 582 U.S. 286, 295–96 (2017). Given the foundational importance of a public trial, the district court jeopardized Salaam's substantial rights when it closed the courtroom without adequately explaining its decision to do so.

> **B.** **Salaam is not entitled to a new trial, despite the erroneous temporary courtroom closure.**

Salaam fails to show that the district court's *Waller* error compromised the fairness, integrity, or public reputation of his trial. To begin, not every *Waller* error requires a new trial—indeed, Guy Waller and his co-petitioners didn't get a new trial in the seminal case, even though the Supreme Court held that they were denied their public-trial guarantee. 467 U.S. at 50. That's because the erroneous courtroom closure had no effect on the government's evidentiary presentation at trial. *Id.* at 49–50. Subsequent precedent emphasizes that we cannot presume that every public-trial error results in the sort of fundamental unfairness that requires a new trial. *Burt*, 949 F.3d at 977 (citing *Weaver*, 582 U.S. at 298). For example, in *Williams v. Burt*, the petitioner's trial was "fundamentally fair," notwithstanding the trial court's "wanting" justification for the courtroom closure. 949 F.3d at 976, 978–79 (quoting *Weaver*, 582 U.S. at 299). There, we held that the petitioner's request for a new trial failed because his unpreserved public-trial claim was dependent on a claim of unfairness that was purely speculative. *Id.* at 979.

Salaam's unfairness claim resembles the arguments of the unsuccessful petitioners in *Waller* and *Burt*. The scope of the courtroom closure was limited such that the "vast majority of [Salaam's] trial took place in an open setting." *Id.* at 978. And the temporary courtroom closure had no material effect on the evidence. Even accepting Salaam's speculation that J.B. might have testified differently in open court, the illicit pictures and videos of J.B. and the Backpage.com advertisement would have been the same.[2] *Id.* at 979 (providing that potential inconsistencies between witness testimony in closed court versus open court "must be considered in the context

---

[2] At oral argument, Salaam claimed that "[J.B.] might have been willing to say things in a closed courtroom that she was unwilling to say when the public is watching her and viewing her." Oral Arg. 7:15–7:33. That is speculative at best and perhaps even concerning given that Salaam attempted to tamper with J.B. through an intermediary before trial. *See infra* Part VII.A.

of the broader evidentiary record"). Indeed, a second trial would feature the same evidence from the first trial—most notably the pictures, videos, and text messages that formed the primary basis for the guilty verdict. *See Waller*, 467 U.S. at 50. A new trial would represent a "windfall" for Salaam because the evidence against him at the first trial was "overwhelming" and would be materially identical if he were tried again. *Id.*; *Williams*, 974 F.3d at 345.

The temporary courtroom closure didn't affect the integrity of the trial either. The district court didn't have a nefarious purpose for closing the courtroom—it wanted to prevent the public from viewing child pornography and likely intended to protect J.B. *See Doe v. Boland*, 630 F.3d 491, 497 (6th Cir. 2011) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 242 (2002)) (explaining that child pornography prohibitions "implicate the interests of real children"). And we do not see anything in the record indicating that "the jury, judge, or prosecutor 'failed to approach their duties with the neutrality and serious purpose that our system demands'" while the courtroom was closed. *Burt*, 949 F.3d at 978 (quoting *Weaver*, 582 U.S. at 304).

Further, the temporary courtroom closure had no effect on the public reputation of the trial. The transparency interest that an open courtroom protects does not give the general public the right to view the child pornography evidence at issue here. Even Salaam acknowledges that the public should not have seen "the offensive material" by conceding that it would have been reasonable to use monitors "available only to the jury and the witness." Appellant's Br. at 19. Moreover, the public's ability to oversee Salaam's trial was otherwise vindicated with the release of the transcript of J.B.'s testimony. *Williams*, 974 F.3d at 346–47; *Burt*, 949 F.3d at 978. At bottom, no reasonable observer could maintain a doubt about the evidentiary basis for Salaam's conviction after reviewing the publicly available trial transcript.

Lastly, the finality interest arising from the jury's well-supported verdict counsels against a new trial. *Williams*, 974 F.3d at 344. Again, the evidence supporting Salaam's conviction was overwhelming and the costs of a retrial—particularly to J.B.—would be significant. *Williams*, 974 F.3d at 345. Accordingly, no miscarriage of justice will result from upholding Salaam's conviction. *See United States v. Jones*, 108 F.3d 668, 672 (6th Cir. 1997) (citing *Olano*, 507 U.S. at 736). Salaam got a fair trial, and the public has all necessary assurances of a well-supported guilty verdict.

## IV.     Testimony on J.B.'s Truthfulness

Nor is Salaam entitled to a new trial because the district court disallowed his attack on J.B.'s character for truthfulness via cross-examination of her mother. *See United States v. Sadler*, 24 F.4th 515, 554 (6th Cir. 2022) ("We generally review the district court's admission or exclusion of evidence for abuse of discretion.") (quotation omitted). Salaam's argument has some merit—the district court called any questions about J.B.'s credibility "fundamentally unfair," even though opinion testimony about a witness's truthful or untruthful character is generally admissible. FED. R. EVID. 608(a).

Even so, any error was harmless. Evidentiary "rulings are harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Clay*, 667 F.3d 689, 700 (6th Cir. 2012) (quotation omitted). We do not overturn a jury verdict based on an evidentiary error where "the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." *United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013).

Salaam's conviction would rest on solid ground even if J.B.'s mother had testified that J.B. was a liar. The jury already knew that J.B. was lying to everyone about what she was doing with

Salaam because she admitted that she lied to the police when they first brought her into custody. It would have come as no surprise that J.B. was dishonest with her mother about what was going on with Salaam. In any event, the other trial evidence forecloses reversal. The jury still would have seen the pornographic material and heard Salaam's voice in the background of the video depicting J.B. The jury still would have seen the Backpage.com advertisement that Salaam created. And the jury still would have seen the text messages that proved Salaam influenced J.B. into prostitution. Accordingly, we reject Salaam's evidentiary challenge as insignificant in view of the overwhelming evidence of his guilt.

**V.      The Indictment and Jury Instructions**

Salaam next claims that the jury instructions constructively amended his indictment for production of child pornography because they absolved the government of proving that he actually took the pornographic pictures and videos of J.B., as opposed to just facilitating their production. A constructive amendment occurs when the jury instructions modify the elements of the charged offense, creating a substantial likelihood that the defendant may have been convicted of a different crime. *United States v. McReynolds*, 964 F.3d 555, 562 (6th Cir. 2020). We review this challenge de novo. *United States v. Bradley*, 917 F.3d 493, 501 (6th Cir. 2019).

Salaam's argument is based on a misreading of the indictment. Properly read, the indictment does not accuse Salaam of taking the pornographic pictures and videos of J.B. himself. The government only alleged that Salaam induced J.B. into engaging in sexually explicit conduct to produce a visual depiction of such conduct. So nothing in the indictment says that the government had to prove that Salaam took the pictures and videos himself. The jury instructions were in harmony with the indictment.

## VI.   Salaam's Counsel

Salaam asserts that the district court should have allowed him to substitute counsel. We review substitution-of-counsel decisions for abuse of discretion. *United States v. Sullivan*, 431 F.3d 976, 979 (6th Cir. 2005). We consider (1) the timeliness of Salaam's request, (2) "the adequacy of the court's inquiry into the matter," (3) the extent of the conflict between Salaam and his counsel, and (4) the balancing of the foregoing factors with "the prompt and efficient administration of justice." *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

We are confident that the district court did not abuse its discretion in handling Salaam's issues with his trial counsel. Salaam first moved for new appointed counsel on January 9, 2018 but withdrew his motion at a hearing on February 7, 2018. From the court's perspective, Salaam's initial issue with his counsel was sorted out after a thorough inquiry that concluded with Salaam twice affirming that he wanted to proceed without changing lawyers. We will not substitute our judgment for that of the district court when, as here, the defendant made an informed and voluntary decision to withdraw his request for new counsel. *See United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990) (providing that further inquiry into whether substitution of counsel is warranted is unnecessary if the court "reasonably believed the problems had been solved").

Later in the case, the court granted Salaam's motion to appoint co-counsel, appointing a second attorney to assist in his defense. After Salaam was found guilty, both appointed attorneys moved to withdraw at Salaam's request. The district court granted those motions to withdraw and allowed Salaam to represent himself at sentencing after an inquiry that comported with the requirements in *Faretta v. California*, 422 U.S. 806 (1975). The district court's actions after Salaam withdrew his first request for new counsel cannot give rise to reversible error because the court granted each of Salaam's subsequent counsel-related requests. And at every turn, the court

made every effort to respect Salaam's wish for his case to proceed as quickly as possible. Therefore, we do not see an abuse of discretion.

## VII.    Sentencing Challenges

As to his sentence, Salaam argues that the district court erred by applying three enhancements to his advisory Guidelines range calculation and misapplying the applicable sentencing factors. We review Salaam's sentencing challenges for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

### A.    Procedural Reasonableness

Salaam first contends that his sentence was procedurally unreasonable because the district court improperly applied three separate two-level sentencing enhancements. The district court calculated Salaam's total offense level as 48—five points above the threshold for an advisory range of life—so he must show that the district court erred in ruling on all three of his Guidelines-based objections for any error to impact his Guidelines range. *United States v. Faulkner*, 926 F.3d 266, 275 (6th Cir. 2019); *see, e.g.*, *United States v. Whyte*, 795 F. App'x 353, 366 (6th Cir. 2019) (holding that the application of an enhancement that did not affect the defendant's total offense level is harmless error).

Our procedural reasonableness review starts and ends with the obstruction of justice enhancement. That enhancement applies when a defendant willfully obstructed or attempted to obstruct their prosecution in a way that was related to the offense of conviction. U.S.S.G. §3C1.1. The district court found that Salaam "made contact with the minor victim prior to trial, [and] tried to convince her not to participate in the criminal case." Sent'g Tr., R. 166, PageID 2070; *United States v. Hills*, 27 F.4th 1155, 1199–1200 (6th Cir. 2022). In one instance, Salaam sent a letter to

J.B. instructing her to stay out of the way of his prosecution. That conduct was intended to influence J.B. not to testify, so the obstruction enhancement applies. U.S.S.G. §3C1.1, cmt. 4(A).

Salaam argues that the district court needed to make additional factual findings before applying the obstruction enhancement because he objected by saying "there's no evidence that I contacted her in any type of way." Sent'g Tr., R. 166, PageID 2076. But there was evidence of Salaam's obstructive conduct. The presentence report summarized the evidence showing that Salaam tried to contact J.B. and her mother. The district court was aware of Salaam's attempted obstruction because it issued a no contact order and a protective order in response to Salaam's conduct. At his sentencing hearing, Salaam did not present any evidence to shed doubt on the reliability or accuracy of the facts in the presentence report. *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003). Therefore, the district court did not err when it relied on those facts to apply the obstruction enhancement.

## B.     Substantive Reasonableness

Salaam argues that a 480-month sentence is substantively unreasonable because it punishes him too severely given his offenses. We disagree.

Substantive reasonableness challenges may succeed when the district court selected the sentence arbitrarily, relied on impermissible factors, disregarded relevant factors, or gave unreasonable weight to any given factor. *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013). When, as here, the challenged sentence is below the Guidelines recommendation, the appealing defendant faces a heavy burden. *Id*.

The district court arrived at its below-Guidelines sentencing decision after balancing the applicable sentencing factors. 18 U.S.C. § 3553(a). The court focused on Salaam's criminal history, including that he committed the instant offenses while on parole and kept offending while

in pretrial custody. It characterized his record as "horrific" and emphasized a need to promote respect for the law. Sent'g Tr., R. 166, PageID 2092–93.; *see* 18 U.S.C. § 3553(a)(1), (a)(2)(A). The way Salaam exploited J.B.'s vulnerabilities as a minor runaway for his own ends highlighted the seriousness of the offense and weighed as an aggravating factor as well. *Id.* Salaam's "refusal to acknowledge any wrongdoing" weighed as yet another aggravating factor, implicating the need for specific deterrence. Sent'g Tr., R. 166, PageID 2094–95; 18 U.S.C. § 3553(a)(2)(B).

The court also considered mitigating factors, including Salaam's family life and his considerable mental health issues. 18 U.S.C. § 3553(a)(1), (a)(2)(D). It acknowledged that Salaam's conduct was not "the worst of the worst" compared to offenders who exploit younger children for sexual purposes. Sent'g Tr., R. 166, PageID 2093; 18 U.S.C. § 3553(a)(6). Ultimately, the court decided that it did not need to sentence Salaam to a Guidelines-recommended life sentence—480 months was sufficient but not greater than necessary to protect the public from the threat of further crimes. 18 U.S.C. § 3553(a)(2)(b), (a)(4), (b)(1). There was no abuse of discretion in the court's weighing of the applicable sentencing factors.

Broadly, Salaam mounts a two-front attack on the district court's application of the § 3553 factors. First, he claims that J.B. was a "willing participant" in his criminal conduct. Appellant's Br. at 43. That's not accurate. While it might be true that J.B. chose to stay with Salaam and engaged in consensual sexual contact with him, the record shows that Salaam pressured her into prostitution and violently forced her to continue after she told him she wanted to stop. The legality of Salaam's sexual relationship with J.B. had no bearing on his offenses of conviction—it was not legal for Salaam to traffic J.B. for sex and use her to create child pornography, which are "horrendous" crimes. *See United States v. McShan*, No. 22-1275, 2023 WL 3035218, at *2 (6th

Cir. Apr. 21, 2023) (citing *United States v. Frei*, 995 F.3d 561, 566 (6th Cir. 2021)). Referring to J.B. as a willing participant distorts the true nature of Salaam's criminal conduct.

Second, Salaam cites to cases in which the defendant was sentenced to a shorter term for sex offenses involving minor victims, as well as Sentencing Commission data on cases involving U.S.S.G. §2G1.3 (the sex trafficking guideline). But Salaam cannot rely on these cases to show substantive unreasonableness because none of them account for his individualized circumstances—especially his criminal history. The generalized sex trafficking Guidelines data he provides is also blind to his criminal history, as well as the details of his offense. The district court's below-Guidelines sentence was supported by thoughtful weighing of the § 3553 factors, and Salaam's substantive reasonableness challenge fails to impeach its exercise of discretion.

## CONCLUSION

For these reasons, we affirm the district court's judgment and sentence.

**CLAY, Circuit Judge, dissenting.** The Sixth Amendment guarantees the right to a public trial. On its own initiative and without justification, the district court in this case excluded the public from arguably the most important testimony in Defendant Ismail Salaam's trial. Because this closure violated Salaam's right to a public trial, he is entitled to a new trial that remains fully open to the public. I respectfully dissent from the majority's refusal to order a new trial.

A public trial "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 508 (1984). Throughout the history that comprises our common law heritage, dating back to the Norman Conquest, trials have been open to the public. *Id.* at 505. Allowing this public scrutiny ensures that fair procedures were followed, benefiting defendants, victims, and the public alike. *Id.* at 508–09.

The Sixth Amendment codified this longstanding practice by providing that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. This enumerated constitutional right protects the same interests that have guaranteed public access to trials throughout history. For example, a public trial serves as a check on judicial and prosecutorial power, ensuring that all parties remain aware of their "responsibility" and "the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)). It ensures that key witnesses to the trial will have notice to come forward to provide testimony. *See In re Oliver*, 333 U.S. 257, 271 n.24 (1948). And it discourages perjury by witnesses who know that their responses will be exposed to the public. *Waller*, 467 U.S. at 46. In short, a public trial is a fundamental building block of fair process in a criminal trial because it alerts all participants that their behavior will be monitored and scrutinized by their peers.

A public trial not only promotes a fair trial for a defendant, but also protects the right of the press and the public to have access to the proceedings.[1] Permitting public access plays a crucial role in enhancing public confidence in the functioning of the criminal legal system as a whole. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enter.*, 464 U.S. at 508 (emphasis in original).

Thus, when courthouse doors are closed, it affects the integrity of the entire judicial process. This is why we treat a public trial violation as a structural error, meaning a defendant need not show prejudice to receive a new trial. *Weaver v. Massachusetts*, 582 U.S. 286, 296 (2017). Violation of the right constitutes structural error because the right does not wholly belong to the defendant—the right also implicates the ability of the public to attend criminal trials. *Id.* at 298–99. Further, because the benefits of the right are often intangible in any particular case, we do not require defendants to show specific prejudice when deprived of the fundamental guarantees of an open and public trial. *Id.*

Because the public trial is a cornerstone of fair process, we have been instructed time and again that the public trial right should be strictly enforced. *See, e.g.*, *Presley v. Georgia*, 558 U.S. 209, 215 (2010) ("Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."). Without a public trial, trial participants could shirk their responsibilities, and the public cannot be confident that a just process produced the verdict. This

---

[1] Although the Sixth Amendment primarily creates an interest that is personal to a criminal defendant, *Gannett*, 443 U.S. at 380, "the right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused." *Weaver v. Massachusetts*, 582 U.S. 286, 298–99 (2017).

is why courtroom closures, when they happen, must be "rare and only for cause shown that outweighs the value of openness." *Press-Enter.*, 464 U.S. at 509. A district court may only close the courtroom after finding that closure supports "an overriding interest that is likely to be prejudiced." *Waller*, 467 U.S. at 48. Even after this showing, the district court may only close the courtroom to the extent necessary to protect such an interest, and after explicitly considering "reasonable alternatives to closing the proceeding." *Id.* Procedurally, a district court must also make sufficient factual findings on the record to support its closure. *Id.* Thus, only in the rarest circumstances and only after sufficient findings that a closure is necessary can a district court exclude the public.

The district court in this case failed to comply with the stringent requirements to close a courtroom during a trial proceeding. Salaam's trial for sex trafficking and child pornography production spanned six days. On the second day of trial, the government called the victim, J.B. to the stand. Through her testimony, the government introduced photos and videos depicting child pornography. Both parties agreed that the public should remain in the courtroom for this testimony, but that the photos and videos should only be displayed to the jury. Despite this agreement, the district court stated that it was "required by law to clear the courtroom of anyone before the presentation" of the photos and videos, and proceeded to close the courtroom. Trial Trans., R. 149, Page ID #1403.

This closure was plainly unlawful. On its own motion, the district court closed the courtroom during arguably the most important testimony in the prosecution's case-in-chief. Ostensibly, the district court sought to do so to limit the viewing of child pornography. But this evidence could have been presented in a way that limited its disclosure to the public while keeping the trial open. Indeed, when defense counsel later objected to closing the courtroom for a second

time, the district court employed a reasonable alternative when child pornography is presented as evidence. Rather than require everyone in the gallery to leave, the district court instead turned certain screens off in the courtroom so that only the attorneys and the jury could view the evidence. Adding to the problematical nature of the district court's actions, the district court failed to make any findings on the record to support the courtroom closure. Once again, this clearly violates the command that district courts must "make findings adequate to support the closure" of the trial to the public. *Waller*, 467 U.S. at 48.

The majority avoids ordering a new trial because Salaam's counsel did not object to the courtroom closure. But the public trial right requires enforcement even absent objection from counsel because "[t]he public has a right to be present whether or not any party has asserted the right." *Presley*, 558 U.S. at 214. For example, in *Press-Enterprise*, the Supreme Court found a courtroom closure unlawful even when both parties agreed that they wanted to close the courtroom. 464 U.S. at 503–04, 513.[2] And, in *Presley*, the Supreme Court confirmed that the trial court has an active role to play in enforcing the public trial right, holding that even if the parties do not present adequate alternatives to closing the courtroom, the trial court must consider alternatives on its own. 558 U.S. at 214.

To state the obvious, even in cases where no parties object to a courtroom closure or where the parties agree to close the courtroom, it is up to the district court to enforce the public's access to the courtroom. The district court's obligation to independently enforce the public trial right recognizes the unique role that this right plays in the criminal system. The parties' interests in an open proceeding often will not align with those of the public. For example, a defendant who is

---

[2] Although *Press-Enterprise* considered the rights of a press organization to access the trial under the First Amendment, the Supreme Court later relied on this holding in defining the scope of the public trial right under the Sixth Amendment. *See Presley*, 558 U.S. at 214–15.

embarrassed by his criminal proceedings may request to have a non-public or secret trial. A district court would surely err in closing a courtroom on such a motion, even if the prosecution agreed to it, because closure would further no valid overriding interest. *Waller*, 467 U.S. at 48. More importantly, a courtroom closure under such circumstances would impermissibly place the defendant's desire to have a non-public trial over the public's right to an open trial. *See Press-Enter.*, 464 U.S. at 509 ("[P]ublic proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct" fairly and justly.). Trial participants are not the only actors who can or should control whether a courtroom remains open. The purposes of the public trial are fundamentally incompatible with this approach. Instead, the ultimate arbiter of whether the courtroom remains open is the district court. When that court errs, it should be corrected, regardless of the positions of the parties.

Even if we were to consider a public trial violation under the traditional plain error review framework, an unlawful courtroom closure would nevertheless warrant reversal. Plain error review requires a showing of four elements: (1) an error; (2) that is plain; (3) that affected a defendant's substantial rights; and (4) that "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). If an unlawful closure amounts to plain error, the third and fourth prongs of plain error review are readily satisfied. The harmless error analysis largely mirrors the third prong of plain error review which requires a defendant to "'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Id.* (citation omitted). Because a public trial violation is a structural error, it is not subject to harmless error review, and therefore always affects a defendant's substantial rights.

Further, a public trial violation always satisfies the fourth prong of plain error review, which requires a showing that "the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (citation omitted). At its core, an open trial sheds light on the proceedings, ensuring that all trial participants are reminded of the responsibilities of their roles and that the public is assured of a fair and just verdict. *See Waller*, 467 U.S. at 46. These functions bear directly on the fairness, integrity, and public reputation of a trial. In fact, it is difficult to conceive of an analogous right that has protections so closely correlated to the considerations of the fourth prong of plain error review. Because the public trial right directly implicates the fourth prong's concerns, this prong is always satisfied by a plainly erroneous courtroom closure.

The majority's justifications for affirming the courtroom closure in this case ignore the reasons for the public trial guarantee and erode its benefits. As an initial matter, the majority acknowledges recent precedent that has not required a new trial when a defendant does not object below. But, in the cases referenced, defendants raised a public trial violation only through an ineffective assistance of counsel claim in post-conviction proceedings. *See Weaver*, 582 U.S. at 292–93; *Williams v. Burt*, 949 F.3d 966, 972 (6th Cir. 2020).[3] Neither *Weaver* nor *Burt* suggests, let alone mandates, that we should decline to correct a public trial violation when presented on direct review.

The majority argues that the courtroom closure did not affect the fairness of Salaam's trial because it was temporary and immaterial. But by evaluating the materiality of the closure based

---

[3] Although this Court stated in *Burt* that *Weaver* was a direct review case, this was imprecise. *Burt*, 949 F.3d at 978. In *Weaver*, Massachusetts' highest court consolidated the defendant's direct appeal with his post-conviction motion for a new trial; however, the defendant only raised his ineffective assistance of counsel and public trial claim in his post-conviction motion. *Weaver*, 582 U.S. at 292–93.

on the outcome of Salaam's trial, the majority does what the Supreme Court has told us is impossible to do—evaluate the effect of a courtroom closure on the outcome of a trial. *See Waller*, 467 U.S. at 49 n.9 ("Because demonstration of prejudice in this kind of case is a practical impossibility, prejudice must necessarily be implied." (quoting *State v. Sheppard*, 438 A.2d 125, 128 (Conn. 1980)). Even if we were to commit ourselves to the impossible task of evaluating prejudice, this closure occurred during the testimony of the victim, arguably the government's most probative witness. And, in this case, the district court closed the courtroom on its own initiative, even though both parties agreed that they could proceed without closing the courtroom. The Supreme Court has told us that this type of unilateral action by a district court, compared to a mistake by counsel, greater diminishes the fairness and public reputation of judicial proceedings. *See Rosales-Mireles v. United States*, 585 U.S. 129, 140 (2018) (holding that erroneous Sentencing Guidelines calculations should almost always warrant reversal because they "ultimately result from judicial error" rather than the trial strategies of counsel).

The majority also claims that the closure had no effect on the public reputation of the trial because the public had no right to see the images presented and because a transcript of the testimony was later released to the public. But whether the public had a right to see the evidence is a *non sequitur*. The question before us is whether Salaam had the right to have the public in the courtroom, and whether the public was entitled to be in the courtroom, not simply whether the public was entitled to view the evidence. Further, the release of the transcript cannot wholly vindicate the public's interest in the public nature of the trial proceedings. To so hold completely negates the public trial right and permits courtrooms to remain closed indefinitely if a transcript of proceedings is eventually made available to the public. *Cf. United States v. Simone*, 14 F.3d 833, 842 (3d Cir. 1994) ("[W]e cannot conclude that the release of the transcript afforded adequate

access in this case. To do so would relax the standard for closure and would undermine one of the essential aspects of access by permitting public scrutiny of the proceedings only at this later time when, in the eyes of the public, a court might have ascertained that nothing embarrassing to the judicial process would appear in the transcript.").

Lastly, the majority claims that finality interests support affirming Salaam's conviction. Ordering a new trial always imposes costs. But failing to correct constitutional violations has costs reaching beyond the particulars of any one case. Salaam's trial was unfair in a way that the Supreme Court has told us affects the fundamental functions and integrity of a criminal trial. The costs of failing to correct this error outweigh any attendant costs of ordering a new trial.

"While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real." *Waller*, 467 U.S. at 49 n.9. Today the majority chips away at these benefits by declining to properly address an error that violated the public trial right and rendered Salaam's trial fundamentally unfair. Because I cannot consent to this erosion of the Sixth Amendment's right to a public trial, I respectfully dissent.